2014 IL App (4th) 140141-B

NO. 4-14-0141

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| CNB BANK & TRUST, N.A., f/k/a | ) | Appeal from |
| CARLINVILLE NATIONAL BANK, | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macoupin County |
| v. | ) | No. 11CH175 |
| FRANCES A. ROSENTRETER, RICK E. | ) | |
| ROSENTRETER, and DOUGLAS G. | ) | |
| ROSENTRETER, as Cotrustees of the Gerald E. | ) | |
| Rosentreter Trust B, | ) | Honorable |
| | ) | Patrick J. Londrigan, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Harris concurred in the judgment and opinion.[1]

**OPINION**

¶ 1        Plaintiff, CNB Bank & Trust, N.A., formerly known as Carlinville National Bank, won a summary judgment on all the counts of its amended complaint, including counts IV, XIII, XIV, and XV. Count IV sought to foreclose a mortgage on tracts 1, 2, 3, 4, 5, and 6, and counts XIII, XIV, and XV sought replevin of some grain bins on tracts 1 and 7. (These seven tracts, all of which are located in Macoupin County, have the following permanent index numbers:  12-000-177-00 (tract 1), 12-000-179-00 (tract 2), 12-000-183-02 (tract 3), 12-000-186-00 (tract 4), 11-000-238-01 (tract 5), 11-000-406-01 (tract 6), and 12-000-177-01 (tract 7).)

---

[1]Oral arguments on plaintiff's petition for rehearing began earlier than scheduled, and by mistake, Justice Steigmann sat on the panel during these oral arguments, instead of Justice Harris, who actually was assigned to this case. Nevertheless, Justice Harris arrived just as the oral arguments were beginning, and *via* the audio-video system in the courthouse, he heard the oral arguments in their entirety. Immediately afterward, we informed the attorneys of the mix-up, and they stated they had no objection.

¶ 2        Defendants, Frances A. Rosentreter, Rick E. Rosentreter, and Douglas G. Rosentreter, in their capacities as cotrustees of the Gerald E. Rosentreter Trust B, appeal from the summary judgment in plaintiff's favor on counts IV, XIII, XIV, and XV and from the denial of their own motion for summary judgment on those counts.  They also challenge other parts of the court's judgment, but let us begin with counts IV, XIII, XIV, and XV.

¶ 3        The cross-motions for summary judgment on count IV raised the question of whether the mortgagor, Frances A. Rosentreter, in her individual capacity, owned more than an undivided 50% of tracts 1, 2, 3, 5, and 6 so as to be able to mortgage those tracts in their entirety. Defendants claim that when Frances A. Rosentreter, in her individual capacity, signed the mortgage in count IV, defendants themselves, in their capacities as cotrustees of the Gerald E. Rosentreter Trust B, owned an undivided 50% of tracts 1, 2, 3, 5, and 6 and that Frances A. Rosentreter therefore succeeded in mortgaging no more than her own undivided 50% of those tracts.  (It is undisputed that she personally owned 100% of tract 4 and therefore succeeded in mortgaging all of that tract.)  Plaintiff, on the other hand, takes the position that Frances A. Rosentreter, in her individual capacity, owned 100% of tracts 1, 2, 3, 5, and 6 and that she consequently mortgaged all the ownership interest in those tracts by signing the mortgage in count IV.  In our *de novo* review, we do not find it to be clear and free from doubt that either plaintiff or defendants were entitled to a judgment as a matter of law on this question of the ownership of tracts 1, 2, 3, 5, and 6.

¶ 4        As for the replevin counts, counts XIII, XIV, and XV, it is a moot question whether the trial court erred by granting summary judgment in plaintiff's favor on those counts, considering that subsequently, in its written judgment of July 26, 2013, the court held the grain bins were fixtures and that, as such, they were to be sold as components of the real estate.  This

was the very holding that defendants had sought in their motion for summary judgment on counts XIII, XIV, and XV.

¶ 5 In the original version of this opinion, we reached the foregoing conclusions regarding counts IV, XIII, XIV, and XV, and we stopped short of the remaining issues in this appeal because we did not want to fall into the error of addressing premature issues. See *Steel City Bank v. Village of Orland Hills*, 224 Ill. App. 3d 412, 416 (1991) ("[C]ourts do not sit to render advisory opinions on abstract questions of law to guide potential future litigation."). However, after considering the arguments for and against plaintiff's petition for rehearing, we have come to appreciate that count IV is intertwined with an additional issue in this appeal, the apportionment of the sale price between tracts 1 and 7, in that it is a moot point whether defendants have an ownership interest in tracts 1, 2, 3, 5, and 6 unless a surplus is created by a reapportionment of the sale proceeds between tracts 1 and 7.

¶ 6 In the foreclosure sales, tracts 1 and 7 were sold together, as one unit, because a grain elevator facility straddled those two tracts. But the owners of tracts 1 and 7 were not all the same, and the two tracts were subject to different mortgages. Therefore, the trial court had to decide how to apportion the sale proceeds between the two tracts after they were sold *en masse*. In this appeal, defendants contend that although tracts 1 and 7 were sold *en masse* for a fair price, the amount of the sale proceeds the court apportioned to tract 1 was unconscionably low.

¶ 7 The apportionment of the sale proceeds between tracts 1 and 7 matters for purposes of count IV because unless a substantially greater amount of the sale proceeds is reapportioned to tract 1 and less to tract 7, the controversy over count IV is academic and of no practical significance. The reason is that plaintiff also won a summary judgment on counts I, II, and III of the amended complaint—deservedly so, defendants agree—and the mortgages in

- 3 -

counts I, II, and III pledge the same six parcels of land (tracts 1, 2, 3, 4, 5, and 6) as the mortgage in count IV, which is *junior* to the mortgages in counts I, II, and III. The total amount owed on the mortgages in counts I, II, and III exceeds, by $2,770,903.43, the total amount that tracts 1, 2, 3, 4, 5, and 6 fetched in the foreclosure sale—unless, out of the $9.1 million that tracts 1 and 7 fetched together, quite a bit more is reapportioned to tract 1, as defendants request.

¶ 8    Because it would be pointless to address count IV in isolation, we have granted plaintiff's petition for rehearing insomuch as it urges us to address the apportionment of sale proceeds between tracts 1 and 7. We agree with defendants that the trial court's apportionment of only $151,666.67 of the sale proceeds to tract 1, out of the $9.1 million for which tracts 1 and 7 sold together, is unconscionably low. This apportionment rested on a misconception of the law, *i.e.*, that a forced sale was "at arm's length" and that consequently the bid for tract 1 could not be regarded as "grossly inadequate." The court ordered that, in the public auction, tracts 1 and 7 first would be offered separately and then together and that how they ultimately would be sold—separately or together—would depend on which method generated the higher sale proceeds. As it turned out, the sale *en masse* did. After confirming the sale *en masse*, the court used the separate bids as indicia of the proportional fair market values of the two tracts. A foreclosure sale, however, is a forced sale (*Deutsche Bank National v. Burtley*, 371 Ill. App. 3d 1, 8 (2006)), and "it is unusual for land to bring its full, fair market value at a forced sale" (*NAB Bank v. LaSalle Bank, N.A.*, 2013 IL App (1st) 121147, ¶ 20). See also *Horney v. Hayes*, 11 Ill. 2d 178, 185 (1957) ("It has long been recognized that property does not bring its full value at forced sales ***.").

¶ 9    On the basis of its erroneous assumption that bids in a foreclosure sale were evidence of fair market value and that such bids therefore could not be considered grossly

inadequate, the trial court apportioned only $151,666.67 of the sale proceeds to tract 1 and the remaining $8,948,333.03 to tract 7. The court's finding that these amounts reflected the fair market value of tracts 1 and 7 is against the manifest weight of the evidence, and the apportionment is an abuse of discretion. We remand this case with directions to reapportion the $9.1 million between those two tracts in accordance with the valuations of an accredited rural appraiser, Mark Akers, since his unrebutted testimony was the only probative evidence offered on the fair market values of tracts 1 and 7. Given his testimony and his written appraisals, the reapportionment should be $6,006,000 to tract 1 and $3,094,000 to tract 7.

¶ 10    Therefore, we reverse the trial court's judgment, and we remand this case for further proceedings. Until defendants, as cotrustees, prove they had an ownership interest in tracts 1, 2, 3, 5, and 6 at the time Frances A. Rosentreter, in her individual capacity, executed the mortgage that is the subject of count IV, the remaining issues in this appeal are premature.

¶ 11                                I. BACKGROUND

¶ 12                    A. The Amended Complaint and the Defendants

¶ 13    The amended complaint has 21 counts and names 21 defendants, 3 of whom appeal. (It is not that there is one count devoted to each defendant; the equivalence between the number of counts and the number of defendants is fortuitous.)

¶ 14    Counts I to XII seek foreclosure. Counts XIII to XVI seek replevin. Counts XVII to XXI are for breach of contract.

¶ 15    Defendants (by which we mean the three defendants in this appeal) are parties only to counts I to IV and counts XIII to XVI. Of those counts, defendants challenge only the outcomes on counts IV, XIII, XIV, and XV—although, as we have mentioned, defendants raise other issues, too.

¶ 16                    B. The Foreclosure Counts (Count I to XII)

¶ 17        Of the 12 foreclosure counts, only count IV is at issue in this appeal. Nevertheless, to understand some of the arguments in this appeal, it helps to have an awareness of the nine tracts of land and the various mortgages and mortgagors to which counts I to XII pertain.  So, before going further, we will briefly summarize the foreclosure counts, counts I to XII.

¶ 18                    1. *Count I (Tracts 1, 2, 3, 4, 5, and 6)*

¶ 19        On January 17, 2006, several makers issued a note in the principal amount of $639,000 to Rabobank, N.A.   The makers were Pleasant View Farms, Inc.; Gerald E. Rosentreter; Frances A. Rosentreter; Rick E. Rosentreter; and Amy R. Rosentreter.

¶ 20        That same day, Gerald E. Rosentreter and Frances A. Rosentreter signed a mortgage in favor of Rabobank, in which they pledged tracts 1, 2, 3, 4, 5, and 6 as security for the note.

¶ 21        Rabobank subsequently assigned the mortgage to Rabo Agrifinance, Inc., which then assigned it to plaintiff (*i.e.*, Carlinville National Bank, now known as CNB Bank & Trust, Inc.).

¶ 22                    2. *Count II (Tracts 1, 2, 3, 4, 5, and 6)*

¶ 23        On September 4, 2008, Rick E. Rosentreter and Amy R. Rosentreter issued a note to plaintiff in the principal amount of $2.5 million.

¶ 24        On the same date, Gerald E. Rosentreter and Frances A. Rosentreter, by their agent under a power of attorney, Rick E. Rosentreter, signed a mortgage, in which they pledged tracts 1, 2, 3, 4, 5, and 6 as security for the note.

¶ 25                    3. *Count III (Tracts 1, 2, 3, 4, 5, and 6)*

¶ 26        On September 4, 2008, Rick E. Rosentreter and Amy R. Rosentreter issued to plaintiff a note in the principal amount of $1.5 million. The note said that future advances, up to that principal amount, would be made "as needed for [the] construction of 3 new 420,000 bushel grain bins."

¶ 27        That same day, Gerald E. Rosentreter and Frances A. Rosentreter, by their agent, Rick E. Rosentreter, signed a mortgage pledging tracts 1, 2, 3, 4, 5, and 6 as security for the note.

¶ 28                4. *Count IV (Purporting To Mortgage Not Only Tract 4 But Also Tracts 1, 2, 3, 5, and 6 in Their Entirety)*

¶ 29        On March 31, 2009, nine makers issued a note in the principal amount of $13.5 million to plaintiff. The makers were all limited liability companies, and on behalf of each of these limited liability companies, an operating manager signed the note. Rick E. Rosentreter signed for Rick Rosentreter, L.L.C., and RRDR, L.L.C. "Frances Rosentreter, Executor," signed for Gerald E. Rosentreter, L.L.C. (Gerald E. Rosentreter died on September 10, 2008.) Matt Weyen signed for Matt Weyen, L.L.C. Brent Rosentreter signed for RRBR, L.L.C.; Brent Rosentreter, L.L.C.; and GRBR, L.L.C. Douglas G. Rosentreter signed for GRDR, L.L.C., and Doug Rosentreter, L.L.C. The note added that each of these individuals personally guaranteed the note.

¶ 30        On October 28, 2010, Frances A. Rosentreter signed a mortgage in plaintiff's favor, without any notation that she was signing in her capacity as executor. The secured debt was "an unlimited personal guaranty of Frances Rosentreter dated 10/28/10 to secure all debts in the name of Illinois Family Farms." The mortgage also recited the amount of the debt: $13.5 million. (Was the note for $13.5 million "in the name of Illinois Family Farms"? The parties assume so, and so will we.) According to this mortgage, dated October 28, 2010, the mortgaged real estate was tracts 1, 2, 3, 4, 5, and 6.

¶ 31    Paragraphs 3(A), (B), (C), (G), (I), and (K) of count IV alleged as follows:

"3. Information concerning Mortgage:

(A) Nature of instrument:  Mortgage.

(B) Date of Mortgage:  October 28, 2010.

(C) Names of Mortgagors:  Frances Rosentreter.

(D) Name of Mortgagee:  Carlinville National Bank.

\* \* \*

(G) Interest subject to the Mortgage:  Fee Simple.

\*\*\*

(I) Both the legal description of the mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty:

Tract 1:  [Legal description.]

Tract 2:  [Legal description.]

Tract 3:  [Legal description.]

Tract 4:  [Legal description.]

Tract 5:  [Legal description.]

Tract 6:  [Legal description.]

\*\*\*

- 8 -

(K) Names of present owners of said premises: Frances A. Rosentreter, Rick E. Rosentreter and Douglas G. Rosentreter, as Co-Trustees of the Gerald E. Rosentreter Trust B established under the Gerald E. Rosentreter Trust No. 1 dated August 4, 2008, as to an undivided 1/2 interest (Tracts 1, 2, 3, 5, and 6); Frances A. Rosentreter, as Trustee under the Frances A. Rosentreter Trust dated August 4, 2008, as to an undivided 1/2 interest (Tracts 1, 2, 3, 5, and 6) AND Frances A. Rosentreter, as Trustee under the Frances A. Rosentreter Trust dated August 4, 2008 (Tract 4)."

¶ 32 In their "Corrected Second Amended Answer," defendants admitted paragraphs 3(A), (B), (C), (D), (G), (I), and (K) of count IV.

¶ 33 5. *Count V (Tract 7)*

¶ 34 On March 10, 2003, Rick E. Rosentreter and Amy R. Rosentreter issued a note to plaintiff in the principal amount of $268,000.

¶ 35 On June 16, 2003, Rick E. Rosentreter and Amy R. Rosentreter signed a mortgage in plaintiff's favor, pledging tract 7 as security for the note.

¶ 36 6. *Count VI (Tract 7)*

- 9 -

¶ 37          On September 4, 2008, Rick E. Rosentreter and Amy R. Rosentreter signed a mortgage in plaintiff's favor, pledging tract 7 to secure the note in the amount of $2.5 million, referenced in count II.

¶ 38                              7. *Count VII (Tract 7)*

¶ 39          On September 4, 2008, Rick E. Rosentreter and Amy R. Rosentreter signed a mortgage in plaintiff's favor, pledging tract 7 as security for the note in the amount of $1.5 million, referenced in count III.

¶ 40                              8. *Count VIII (Tract 7)*

¶ 41          On October 28, 2010, Rick E. Rosentreter and Amy R. Rosentreter signed a mortgage in plaintiff's favor, pledging tract 7 as security for the note in the amount of $13.5 million, referenced in count IV.

¶ 42                              9. *Count IX (Tract 8)*

¶ 43          On January 17, 2006, Douglas G. Rosentreter and Cristy L. Rosentreter issued to Rabobank a note in the principal amount of $520,000.

¶ 44          That same day, they mortgaged tract 8 to Rabobank to secure the note.

¶ 45          Rabobank assigned the mortgage to Rabo Agrifinance, which in turn assigned it to plaintiff.

¶ 46                              10. *Count X (Tract 8)*

¶ 47          On August 27, 2008, Douglas G. Rosentreter issued to plaintiff a note in the principal amount of $1.2 million.  The note said that future advances, up to that principal sum, would be made "as needed for grain bin construction."

¶ 48          That same day, Douglas G. Rosentreter and Cristy L. Rosentreter signed a mortgage in plaintiff's favor, pledging tract 8 as security for the note.

¶ 49                    11. *Count XI (Tract 8)*

¶ 50        On October 27, 2010, Douglas R. Rosentreter and Cristy L. Rosentreter signed a

mortgage in plaintiff's favor, pledging tract 8 to secure the note in the amount of $13.5 million,

referenced in count IV.

¶ 51                    12. *Count XII (Tract 9)*

¶ 52        On October 28, 2010, Matthew Weyen signed a mortgage in plaintiff's favor,

pledging tract 9 to secure the note in the amount of $13.5 million, referenced in count IV.

¶ 53              C. The Cross-Motions for Summary Judgment

¶ 54                    1. *Count IV*

¶ 55        Plaintiff filed a motion for summary judgment on all counts of the amended

complaint, including count IV.

¶ 56        Defendants, as cotrustees of the Gerald E. Rosentreter Trust B, filed a cross-

motion for summary judgment on count IV.  They contended that, in the mortgage dated October

28, 2010, Frances A. Rosentreter could not have mortgaged more than an undivided half of tracts

1, 2, 3, 5, and 6, considering that, according to plaintiff's own admission in paragraph 3(K) of

count IV, the Gerald E. Rosentreter Trust B owned the other undivided half of those tracts.

Again, paragraph 3(K) of count IV reads as follows:

> "(K) Names of present owners of said premises:  Frances
>
> A. Rosentreter, Rick E. Rosentreter and Douglas G. Rosentreter, as
>
> Co-Trustees of the Gerald E. Rosentreter Trust B established under
>
> the Gerald E. Rosentreter Trust No. 1 dated August 4, 2008, *as to*
>
> *an undivided 1/2 interest* (Tracts 1, 2, 3, 5, and 6); Frances A.
>
> Rosentreter, as Trustee under the Frances A. Rosentreter Trust

- 11 -

dated August 4, 2008, *as to an undivided 1/2 inte[r]est* (Tracts 1, 2, 3, 5, and 6) AND Frances A. Rosentreter, as Trustee under the Frances A. Rosentreter Trust dated August 4, 2008 (Tract 4)." (Emphases added.)

¶ 57        Plaintiff, on the other hand, relied on defendants' admission of paragraph 3(G) of count IV, which alleged:  "Interest subject to the Mortgage:  Fee Simple."  Plaintiff argued that by admitting Frances A. Rosentreter had a "Fee Simple" interest in tracts 1, 2, 3, 4, 5, and 6, defendants admitted she was the full owner of those tracts.

¶ 58        The trial court granted plaintiff's motion for summary judgment on count IV and denied defendants' cross-motion for summary judgment on that count.

¶ 59        Defendants moved for reconsideration.  In their motion for reconsideration, they requested the trial court to take judicial notice of the inventory from *In re Estate of Gerald E. Rosentreter*, Macoupin County case No. 2009-P-139, showing that when Gerald E. Rosentreter died on September 10, 2008 (the month before the signing of the mortgage in count IV), he owned an undivided half of tracts 1, 2, 3, 5, and 6.  Defendants also submitted an executor's deed, recorded in Macoupin County on December 29, 2010, in which Frances A. Rosentreter, as the executor of Gerald E. Rosentreter's will, conveyed an undivided half of tracts 1, 2, 3, 5, and 6 to the Gerald E. Rosentreter Trust B.

¶ 60        The trial court declined to vacate the summary judgment in plaintiff's favor on count IV.

¶ 61                                 2. *Counts XIII, XIV, and XV*

¶ 62        Counts XIII, XIV, and XV were replevin counts.  In those counts, plaintiff sought possession of the grain bins erected on tracts 1 and 7.

¶ 63 Defendants moved for a summary judgment on those counts, contending that the grain bins were fixtures rather than personal property and that replevin was a remedy limited to personal property.

¶ 64 The trial court denied defendants' motion for a summary judgment on counts XIII, XIV, and XV. Ultimately, however, in the judgment of foreclosure, the trial court found that the grain bins were indeed fixtures, and the court ordered that they were to be sold as parts of the real estate.

¶ 65 D. The Judgment of Foreclosure

¶ 66 In a judgment entered on July 26, 2013, the trial court foreclosed the mortgages on tracts 1 to 9 and ordered the sale of the nine tracts in a public auction.

¶ 67 One of the findings in this judgment was that, in the mortgage referenced in count IV, Frances A. Rosentreter succeeded in pledging tracts 1, 2, 3, 4, 5, and 6 in their entirety.

¶ 68 E. The Trial Court's Directions
on How Tracts 1 and 7 Were To Be Auctioned

¶ 69 Because a grain elevator facility straddled two adjacent tracts, tracts 1 and 7, it was unclear whether selling those two tracts separately, as opposed to *en masse*, would fetch the greatest amount of sale proceeds. Therefore, the trial court ordered that tracts 1 and 7 first would be offered for sale separately and that, immediately afterward, they would be offered for sale together. If the highest bids when they were offered separately exceeded the highest bid when they were offered together, they would be sold separately. By the same token, if the highest bid when they were offered together exceeded the highest bids when they were offered separately, they would be sold together. Of course, this method of conducting the sale would be announced to the public ahead of time.

¶ 70 F. The Foreclosure Sale

¶ 71     The foreclosure sale occurred in the Macoupin County courthouse on November 8, 2013. A private auctioneer, Mike Huber, conducted the sale.

¶ 72     Huber first offered tracts 1 and 7 separately. The highest bids for them separately were $150,000 for tract 1 and $8.85 million for tract 7: a total of $9 million. Defendants claim that plaintiff was the one that made the bid of $150,000 for tract 1, but plaintiff claims that Jeff Behme did so. It is undisputed that plaintiff made the bid of $8.85 million for tract 7.

¶ 73     Huber then offered tracts 1 and 7 together, and plaintiff bid $9.1 million. No one else bid for tracts 1 and 7 *en masse*.

¶ 74     Thus, tracts 1 and 7 brought a higher amount of sale proceeds *en masse* than separately. Separately, they brought $9 million. *En masse*, they brought $9.1 million.

¶ 75     G. Plaintiff's Motions To Confirm the Foreclosure Sales and To Apportion the Sale Proceeds Between Tracts 1 and 7

¶ 76     On December 12, 2013, plaintiff filed two separate motions: a "Motion for Confirmation of Sale" and a "Motion for Apportionment of Sales Price Between Tracts 1 and 7."

¶ 77     On December 20, 2013, defendants filed a "Motion for Evidentiary Hearing With Court Reporter." In this motion, defendants requested that the hearing on plaintiff's motions for confirmation of the foreclosure sale and for apportionment of the sale proceeds "be scheduled as an evidentiary hearing with a court reporter present."

¶ 78     On January 24, 2014, defendants filed a "Response to Motion for Apportionment of Sales Price Between Tracts 1 and 7," in which they stated that $9.1 million was "not an unreasonable value" for tracts 1 and 7 *together* and that they therefore did not object to plaintiff's motion to confirm the sale. Defendants argued, however, that, out of the $9.1 million, apportioning only $150,000 to tract 1 (the amount of the separate bid for tract 1) would be "grossly inadequate compared to the fair market value for Tract 1 of $5.6 million." Defendants

- 14 -

further argued that "the separate bid by the Plaintiff for Tract 7 for $8,850,000 [was] grossly inflated compared to the fair market value for Tract 7 of approximately $2,875,000." Defendants attached to their response, as exhibits A and B, appraisals by Akers Group Appraisal Services, Inc., which opined that the fair market value of tract 1 was $5.6 million and that the fair market value of tract 7 was $2.875 million.

¶ 79　　　　On January 30, 2014, the trial court held a hearing on plaintiff's motion for confirmation of the sale and also on plaintiff's separate motion for an apportionment of the sale price between tracts 1 and 7. Defendants reiterated their agreement with plaintiff's motion for confirmation of the sale, and therefore the court granted that motion.

¶ 80　　　　Defendants continued to disagree, however, with plaintiff's other motion, the motion for an apportionment of the sale proceeds. The parties agreed, of course, that the $9.1 million from the sale of tracts 1 and 7 *en masse* had to be apportioned between those two tracts, but they disagreed on what that apportionment should be. Over plaintiff's objection, the trial court allowed defendants to present evidence on this issue.

¶ 81　　　　Defendants called two witnesses: Mark Akers and Rick E. Rosentreter. Plaintiff called no witness. Defendants' two witnesses testified substantially as follows.

¶ 82　　　　　　　　　　　　　1. *Testimony by Mark Akers*

¶ 83　　　　　　　　　　　　　a. His Qualifications

¶ 84　　　　Mark Akers, the proprietor of Akers Group Appraisal Services, Inc., testified he was a real estate appraiser licensed by the state of Illinois. The requirements for that license were 300 hours of education, supplemented by "ongoing education courses"; a bachelor's degree; and experience in the form of 3,000 documented hours working with a certified appraiser.

¶ 85 Over and above his state licensure, Akers was an accredited member of the American Society of Farm Managers and Rural Appraisers. From that professional society, he had the designation of accredited rural appraiser. Defendants' attorney asked him:

"Q. And what did you have to do to become an accredited member of that society?

A. Well, the current requirements are, in addition to a college degree, being a certified general appraiser, 121 hours of additional specialized education in the rural appraisal field plus five years of experience in the field that's followed by a demonstration in an appraisal report demonstrating your abilities to complete an appraisal report and assignment which is reviewed by a panel and graded.

The final step is a three-day comprehensive exam.

Q. Okay. And would you say you have any specialization in the area of real estate valuation?

A. Yes. I specialize in appraisal of agricultural and rural properties and specifically the appraisal of agribusiness type properties."

¶ 86 Akers testified that, during his 29-year career thus far, he had done approximately 7,000 appraisals of agricultural real estate. Of those appraisals, approximately 700 were of commercial grain elevator properties. Approximately six or seven times, he had been accepted as an expert witness on real estate valuation.

¶ 87 Plaintiff's attorney, Richard L. Heavner, stated he had no objection to Akers's qualifications to testify as an expert in real estate valuation. The trial court found him to be qualified.

¶ 88 b. His Inspection of Tracts 1 and 7

¶ 89 At the request of Rick E. Rosentreter and his attorney, Jason T.H. Germeraad (who represents the other defendants as well), Akers appraised the two tracts on which a grain elevator facility stood, tracts 1 and 7.

¶ 90 The grain elevator facility is on Illinois Route 4, about 1 1/2 miles north of Carlinville. On November 25, 2013, Akers drove to the facility. Upon Akers's arrival, however, the receiver, Timothy McHenry, refused to allow him to set foot on the property. Therefore, Akers inspected the facility from the public road and from adjoining fields. He took photographs and also referred to "the auction brochure[,] which had a fairly detailed description of the improvements."

¶ 91 c. The Approaches Akers Used in Appraising Tracts 1 and 7

¶ 92 Akers testified he used two approaches in his valuation of tracts 1 and 7: the cost approach and the sales comparison approach. Germeraad asked him:

"Q. Can you explain the cost approach briefly?

A. Basically, the cost approach values the land at market value, using market value sales of land. It estimates the value of the improvements in their current condition and utility. We add the two together which arrives at a market value indication of the property.

* * *

- 17 -

Q. *** Can you explain the sales comparison approach?

A. The sales comparison approach compares similar facilities on a head-to-head basis of valuating differences in quality and condition and location and makes adjustments appropriately from the sale to indicate what the value of the subject is.

Q. Is that based on other sales of comparable grain elevator facilities?

A. It is."

¶ 93　There was a third approach to the valuation of real estate, the income approach, which Akers did not use in this instance. Germeraad asked him:

"Q. Okay. And then can you explain the income approach?

A. The income approach, basically we go to the market. We find capitalization rates which are—I use a direct capitalization rate. In a direct capitalization, we have a sale of a property. We have an estimate of what its annual income is. You divide the annual income by the sale price. That gives you a direct capitalization rate.

Then we take our subject property. We estimate what the income potential for one year is. We divide it by that rate and that gives us a market value."

Akers testified the reason he omitted the income approach was that McHenry had "denied [him] the lease information. Germeraad asked Akers:

"Q. Okay. So of the three methods of valuation specifically relating to this property, which do you believe to be the most reliable, second most reliable, and the least reliable?

A. Well, the heavily improved property with newer structures, with primarily newer structures, the cost approach is a reliable approach, and I felt it was probably the most applicable in this case, followed by the sales comparison approach.

The income approach, had I used it, would have at best been support for the other two.

Q. And why do you think the income approach would not be a very reliable indicator of value in this case?

A. In the market—well, most of these types of facilities are owner-operated, and owner-operated income carries with it a large portion of business income or value from that business income based on the particular owner.

So when we do an income approach, we're looking at leases. Lease information is frequently hard to come by for these facilities because of confidentiality agreements, differences in facilities, and locations of different facilities.

So because of the lack of abundant lease information, I consider it generally less reliable."

¶ 94    d. His Opinion as to the Fair Market Values of Tracts 1 and 7

¶ 95    (i) *Tract 1*

¶ 96        According to the appraisal by Akers admitted in evidence as exhibit A, tract 1 was approximately 70 acres, consisting of 60 acres of cropland, 7 acres of improvements, and 3 acres of roads or waste.  Under the heading of "Property Description," Akers wrote:

> "The grain storage on the subject consists of 3,005,000 bushels of storage.  415,000 bushels of storage are in Grain Tank 19.  Grain Tank 19 is split by the property line.  100,000 bushels of storage [are] in the flat Quonset building.  It is unclear if this building is cut by the property line.  The 15,000 bushel per hour receiving pit and Grain leg appear[] to be completely on the subject property."

¶ 97        Both in his testimony and in exhibit A, Akers opined that the 70-acre parcel, tract 1, had a fair market value of $5.6 million.

¶ 98                              (ii) *Tract 7*

¶ 99        According to the appraisal by Akers admitted in evidence as exhibit B, tract 7 was approximately 10 acres and was entirely an improved plot, without any cropland.  Under the heading of "Property Description," Akers wrote:

> "The grain storage on the subject consists of 1,484,300 bushels of storage.  415,000 bushels of storage are in Grain Tank 19.  Grain Tank 19 is split by the property line.  There is also a house, outbuildings and support facilities for the grain storage facilities.  A 30,000 gallon anhydrous bottle and 4[-]way dock are located at the east end of the property."

¶ 100    In exhibit B and in his testimony, Akers opined that the 10-acre parcel, tract 7, had a fair market value of $2.875 million.

¶ 101                          e. The Cross-Examination of Akers

¶ 102                          (i) *Whether Tract 1 Had a Grain Pit*

¶ 103    On cross-examination, Heavner asked Akers:

> "Q. Did you know and did you base your appraisal of the
> 70-acre tract on the fact that there's no way of getting the grain in
> or out of the grain bins?  There's no grain pit on the 70-acre tract?
>
> A. That was addressed in my appraisal."

¶ 104    According to Akers's appraisal of tract 1, which was admitted in evidence as exhibit A, tract 1 actually has a "15,000 BPH [(bushel per hour)] Receiving Pit."  The appraisal includes photographs of the pit.

¶ 105    According to exhibit B, the appraisal of tract 7, that tract has, by comparison, a "6,700 BPH Receiving Pit."

¶ 106                          (ii) *Grain Bin No. 19 and the Quonset Building*

¶ 107    Heavner further asked Akers:

> "Q. Did you know that there has been no survey done but it
> is the belief of all the parties to this case that one of the grain bins
> is split in half by the property line and one of the buildings is split
> in half by the property line?
>
> A.  The grain bin specifically was addressed in the
> appraisal.
>
> Q. The long Quonset building part of it is addressed?

A. The information I had was unclear on the Quonset building.

* * *

[Q.] Do you know whether or not the Quonset hut is cut in between the boundary lines?

[A.] The evidence I had put it right on the line. I didn't believe it was cut."

¶ 108        As we said, exhibits A and B repeatedly noted that the property line between tracts 1 and 7 went through grain bin No. 19. As for the Quonset building, exhibit A said: "It is unclear if this building is cut by the property line."

¶ 109                          2. *Testimony by Rick E. Rosentreter*

¶ 110        Rick E. Rosentreter testified he was one of the defendants in this case and that on November 8, 2013, he went to the foreclosure sale at the Macoupin County courthouse. He observed the auction from start to finish, and "[t]racts 1 and 7 were offered separately, and then they were offered later as a combined, one sale together."

¶ 111        Germeraad asked him:

"Q. Okay. Relating to the separate sale of tract 1, do you recall all the bids that were made on the separate sale of tract 1?"

A. There was an opening bid by a third party of 100,000, and then the second bid was the winning bid by the plaintiffs of 150,000.

Q. Okay. And do you recall the bids that were made relating to the separate sale of tract 7?

A. There was only one bid made by the plaintiff for 8.85 million.

Q. Okay. And then you said tracts 1 and 7 were sold together?

A. Yes.

Q. Do you recall the bids made on that sale?

A. There was only one bid made by the plaintiff in the amount of 9.1 million."

¶ 112     Germeraad identified exhibit C as the brochure provided at the auction. Exhibit C was admitted in evidence.

¶ 113     On cross-examination by Heavner, Rick E. Rosentreter admitted he "got a bidding number" before the auction began. Considering that, in Akers's opinion, tract 1 was worth $5.6 million, Heavner asked Rick E. Rosentreter why he himself did not bid $150,001 for tract 1. He answered:

"A. As far as the date of sale . . .

Q. It speaks for.

A. . . . whether I was in a position to buy or whether I was interested in buying is my own decision.

Whether it's a bargain to somebody depends on what the reason is that they would want the elevator and I didn't want the real estate.

I'm not in a position to answer those kinds of questions.

> Q. Mr. Rosentreter, if it was worth $5,600,000, why
> wouldn't you have purchased it for $150,001 and turned around
> and sold it the next day for $5,600,000? You're a businessman.
>
> A. That's correct.
>
> [Q.] The question is why didn't you?
>
> [A.] I can't. I have a conflict of interest or I would have
> sure as heck bought it I will tell you."

Again, Rick E. Rosentreter is one of the trustees of the Gerald C. Rosentreter Trust B, which, defendants claim, has an ownership interest in tract 1. See *O'Halloran v. Fitzgerald*, 71 Ill. 53, 58 (1873) ("[The trustee] could not buy in an outstanding title, and set up title in himself, nor could he buy in the land for taxes, and set up the title to defeat the title of the *cestui que trust*."); George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 543(C), at 292-93 (rev. 2d ed. 1993) ("A majority of the decisions which have considered the problem have held that it is a violation of his fiduciary duty for a trustee *** to purchase on such a forced sale [of trust property]." (Emphasis omitted.)).

¶ 114    Heavner further asked Rick E. Rosentreter:

> "Q. Would you agree with my estimate that there were
> probably a hundred people or more in the courtroom?
>
> A. There was plenty, yes."

¶ 115    At the conclusion of the evidence, Heavner proposed distributing the $9.1 million in sale proceeds in the same proportion as the initial bids of $150,000 for tract 1 and $8.85 million for tract 7. The initial bids totaled $9 million. The bid of $150,000 for tract 1 was 1.6666% of $9 million. By calculating 1.6666% of $9.1 million, one arrived at $151,666.67, the

amount of the sale proceeds to be apportioned to tract 1. The remaining $8,948,333.03 of the sale proceeds was to be apportioned to tract 7 under Heavner's proposal.

¶ 116 Germeraad objected to this method of apportionment. He argued that, under Heavner's proposal, the undervaluation of tract 1 would be so extreme as to be unconscionable. Instead, Germeraad proposed apportioning the $9.1 million in sale proceeds in accordance with ratios derived from Akers's appraisals. In Akers's opinion, tract 1 had a fair market value of $5.6 million, and tract 7 had a fair market value of $2.875 million. The total of those two figures was $8.475 million. The fair market value of tract 1 was 66% of that total. By calculating 66% of $9.1 million, one arrived at $6.006 million, the amount to be apportioned to tract 1. The remaining $3.094 million was to be apportioned to tract 7 under Germeraad's proposal.

¶ 117 The trial court rejected Germeraad's proposal because the court disagreed with his underlying premise that the bid of $150,000 for tract 1 was grossly inadequate. The court reasoned:

> "THE COURT: Well, they were not grossly inadequate. They were all done at arm's length.
>
> By reading the statutes and by reading the case authority, it says in the absence of estate fraud, violation of the duty officer conducting the sale, mere inadequacy of price is not a sufficient reason to disturb a judicial sale.
>
> Then it goes on to say mere inadequacy of price is not sufficient reason to disturb a judicial sale unless there were some other irregularities."

- 25 -

The court did not find anything underhanded or fraudulent about the auction. All that defendants had presented, it seemed to the court, was "an appraisal that [did not] agree with the sale price"—a sale price established "at arm's length." Therefore, the court apportioned the sale proceeds in accordance with Heavner's proposal: $151,666.67 to tract 1 and $8,948,333.03 to tract 7.

¶ 118                                    II. ANALYSIS

¶ 119                    A. Our Nondeferential Standard of Review,
                           Despite the Motion for Reconsideration

¶ 120        When parties file cross-motions for summary judgment, they agree that the case presents only questions of law, and they invite the trial court to decide these legal questions on the basis of the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Obviously, the court need not agree with the parties' assessment. A court cannot legitimately conclude, merely from the filing of cross-motions for summary judgment, that there really is no issue of material fact or that one party or the other really is entitled to a judgment as a matter of law. *Id.* The trial court must make its own independent assessment—as must we. Our standard of review is *de novo*. *Id.* ¶ 30.

¶ 121        Just because a party requested the trial court to reconsider the summary judgment, it does not follow that what would otherwise be a *de novo* standard of review is transformed into a deferential standard of review. Granted, the cases say that when reviewing the ruling on a motion for reconsideration, we should ask whether the trial court abused its discretion; but abuse of discretion is "a versatile standard of review in that, depending on what the underlying issue is, it can lead to other standards of review." *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 22. Where, as in this case, the underlying issues are legal rather than factual, "we will proceed *de novo*." *Id.* ¶ 24. See also *O'Shield v. Lakeside Bank*, 335 Ill. App. 3d 834, 838 (2002) (noting that a "party cannot convert the *de novo* standard applicable to the original motion into an abuse of discretion standard simply by asking the court to reconsider its previous ruling"). "A trial

- 26 -

court order granting summary judgment presents a question of law, which we review *de novo*." *Feliciano v. Geneva Terrace Estates Homeowners Ass'n*, 2014 IL App (1st) 130269, ¶ 30. The nature of the question does not change simply because defendants filed a motion for reconsideration. See *O'Shield*, 335 Ill. App. 3d at 838.

¶ 122                    B. Count IV: Foreclosure

¶ 123        When a party files a motion for summary judgment, the question is whether "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). That is the question in the trial court, and that it also is the question on appeal. In answering that question, "[t]he court must construe the pleadings, depositions, admissions and affidavits strictly against the moving party and liberally in favor of the respondent." *Feliciano*, 2014 IL App (1st) 130269, ¶ 30.

¶ 124        As we said, plaintiff sought a summary judgment on count IV. In its motion for summary judgment, plaintiff took the position that Frances A. Rosentreter had succeeded in mortgaging 100% of tracts 1, 2, 3, 4, 5, and 6 when she signed the mortgage on October 28, 2010.

¶ 125        Defendants filed a cross-motion for summary judgment on count IV. They sought a summary judgment that although Frances A. Rosentreter had succeeded in mortgaging 100% of tract 4, she had succeeded in mortgaging only her undivided 50% of tracts 1, 2, 3, 5, and 6, considering that, at the time she signed the mortgage, they, as the cotrustees of the Gerald E. Rosentreter Trust B, owned the other undivided 50% of those tracts. See *Cadle Co. II v. Stauffenberg*, 221 Ill. App. 3d 267, 269 (1991); *Miles Homes Inc. of Illinois v. Lyons*, 8 Ill. App. 3d 179, 181 (1972).

- 27 -

¶ 126    We first will scrutinize plaintiff's motion for summary judgment on count IV, and then we will scrutinize defendants' cross-motion for summary judgment on count IV.

¶ 127    On appeal, plaintiff argues that because defendants admitted paragraph 3(G) of count IV of the amended complaint, there was no genuine issue as to whether Frances A. Rosentreter owned 100% of tracts 1, 2, 3, 5, and 6 when she signed the mortgage on October 28, 2010, and hence plaintiff was entitled to a judgment as a matter of law on count IV.

¶ 128    Paragraph 3(G) of count IV, which defendants admitted, alleged as follows: "Interest subject to the Mortgage:  Fee Simple."  Plaintiff reasons that, under section 15-1504(a)(3)(G) of the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1504(a)(3)(G) (West 2012)), the term "fee simple" is alternative to and exclusive of the term "undivided interest." According to that section, the "foreclosure complaint" must set forth "[i]nformation concerning [the] mortgage," including the "[i]nterest subject to the mortgage," and then, in parentheses, the section instructs the pleader to "here insert whether fee simple, estate for years, undivided interest, etc." *Id.*  Plaintiff argues that if the drafter of a foreclosure complaint chooses one of these parenthetical descriptive terms, "fee simple," the drafter cannot also choose another of the terms, such as "undivided interest."

¶ 129    In our *de novo* interpretation of this statute (*Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004); *Country Mutual Insurance Co. v. State Farm Mutual Automobile Insurance Co.*, 339 Ill. App. 3d 78, 81 (2003)), we see no reason to regard "fee simple" as exclusive of "undivided interest."  The statute does not say those two terms are exclusive of one another, and in the common law of Illinois, there is no dichotomy between ownership in fee simple and ownership of an undivided share.  See, *e.g.*, *Baker v. Forsuman*, 15 Ill. 2d 353, 362 (1958) ("[T]he defendants are the owners in fee simple of an undivided 1/10 of the property.

- 28 -

The plaintiffs are each the owners in fee simple of an undivided 1/9 of the remaining 9/10."); *Brod v. Brod*, 390 Ill. 312, 326 (1945) ("The decrees appealed from are affirmed in so far as they declare that appellee and appellant are each vested with an undivided one-half interest in fee simple as joint tenants ***."); *Grubmeyer v. Mueller*, 385 Ill. 529, 537 (1944) ("[U]pon her death the appellees became the owners in fee simple of an undivided one-half of the land in controversy ***.").

¶ 130      "[W]ords and phrases having well-defined meanings in the common law are interpreted to have the same meanings when used in statutes dealing with the same or similar subject matter as that with which they were associated at common law." *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 983 (1975).   The supreme court has adopted the meaning of "fee simple" set forth in two classic treatises on the common law:   Blackstone's Commentaries and Kent's Commentaries.   The supreme court cited those two treatises in *Woods v. Seymour*, 350 Ill. 493, 497 (1932), when explaining why the deed in that case conveyed a lesser estate than fee simple:

> "The language of the grant *** did not import an estate in fee simple, which is a pure inheritance, clear of any qualification or conditions, and must be given or granted generally, absolutely and simply.  (2 Blackstone's Com. 104; 4 Kent's Com. 5.)"

¶ 131      The cited page of Blackstone says, in part:

> "I. Tenant in fee-simple (or, as he is frequently styled, tenant in fee) is he that hath lands, tenements, or hereditaments, to hold to him and his heirs forever; generally absolutely, and simply; without mentioning *what* heirs, but referring that to his own

- 29 -

pleasure, or to the disposition of the law."  (Emphasis in original.) 2 William Blackstone, Commentaries on the Laws of England, at 104 (1857).

¶ 132        The cited page of Kent says, in part:

"1. Fee Simple is a pure inheritance, clear of any qualification or condition, and it gives a right of succession to all the heirs generally, under the restriction that they must be of the blood of the first purchaser, and of the blood of the person last seised.  (a) It is an estate of perpetuity, and confers an unlimited power of alienation, and no person is capable of having a greater estate or interest in land.  Every restraint upon alienation is inconsistent with the nature of a fee simple; and if a partial restraint be annexed to a fee, as a condition not to alien for a limited time, or not to a particular person, it ceases to be a fee simple, and becomes a fee subject to a condition."  4 James Kent, Commentaries on American Law, at 5 (14th ed. 1896).

¶ 133        In sum, then, "[a] 'fee simple' is an estate of inheritance without condition, belonging to the owner, and alienable by him or her or transmissible to his or her heirs absolutely and simply."  18 Ill. L. and Prac. *Estates* § 5, at 10 (2003) (citing *Woods*, 350 Ill. 493). Regardless of whether a person owns the north 50 acres of Blackacre or an undivided 50% of Blackacre, that person has a fee simple if his or her ownership is unconditional, in perpetuity, and with an absolute power to alienate and devise the property.  That an undivided share of land can be owned in fee simple is evident from Blackstone's comment that "hereditaments" can be

owned in fee simple. An undivided ownership interest in land can be a hereditament (it can be inherited); therefore, it can be owned in fee simple.

¶ 134　　　　Thus, we disagree that by admitting the mortgagor, Frances A. Rosentreter, had a fee-simple interest in tracts 1, 2, 3, 5, and 6, defendants admitted she owned 100% of those tracts.

¶ 135　　　　Granted, paragraph 3(I) of count IV—a paragraph which defendants likewise admitted—alleged that tracts 1, 2, 3, 4, 5, and 6 were "the mortgaged real estate." But that allegation would be true even if Frances A. Rosentreter had mortgaged only an undivided percentage of those tracts. If indeed she owned an undivided percentage, something less than 100%, it would be impossible to say that any particular acreage or footage of those tracts was free of the mortgage. Assume, for instance, that a cotenant, owning an undivided 50% of Blackacre, pledges Blackacre as security for a loan. As a result, Blackacre, not any particular area of Blackacre, would become "mortgaged real estate"—but the mortgage would extend only to the cotenant's undivided percentage of ownership (*Cadle*, 221 Ill. App. 3d at 269).

¶ 136　　　　So, when we construe paragraphs 3(G) and (I) of count IV strictly against plaintiff and liberally in favor of defendants (see *Feliciano*, 2014 IL App (1st) 130269, ¶ 30), plaintiff's right to a summary judgment that Frances A. Rosentreter, individually, owned 100% of tracts 1, 2, 3, 5, and 6 is not "clear and free from doubt" (*Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005)). Just because the "[i]nterest subject to the [m]ortgage" was "[f]ee [s]imple" and just because tracts 1, 2, 3, 5, and 6 were "the mortgaged real estate," it does not necessarily follow that by signing the mortgage in count IV, Frances A. Rosentreter succeeded in mortgaging the full ownership interest in those tracts as opposed to an undivided percentage of each of them.

¶ 137    Having determined, on the basis of the pleadings, that plaintiff was not entitled to a judgment as a matter of law that Frances A. Rosentreter owned 100% of tracts 1, 2, 3, 5, and 6 when she signed the mortgage in count IV, we next address the question of whether defendants were entitled to a judgment as a matter of law that she owned only an undivided half of tracts 1, 2, 3, 5, and 6 when she signed the mortgage.

¶ 138    Defendants relied on paragraph 3(K) of count IV, which identified them, the trustees of the Gerald E. Rosentreter Trust B, as the "present owners" of "an undivided 1/2 interest (Tracts 1, 2, 3, 5, and 6)" and Frances A. Rosentreter, the trustee of the Frances A. Rosentreter Trust, as the "present owner[]" of the other undivided half interest in those tracts. Defendants argue that, by plaintiff's own admission in paragraph 3(K) of count IV, Frances A. Rosentreter, in her individual capacity (or in her capacity as the trustee of the trust bearing her name), owned no more than an undivided half of tracts 1, 2, 3, 5, and 6 and hence was incapable of mortgaging more than an undivided half of those tracts.  (Frances A. Rosentreter was the executor of Gerald E. Rosentreter's will when she signed the mortgage of October 28, 2010, but the parties appear to agree she signed the mortgage only in her individual capacity, not in her capacity as executor.)

¶ 139    Plaintiff counters that because paragraph 3(K) identifies only the "present owners" of tracts 1, 2, 3, 5, and 6—that is, the persons who owned those tracts on May 7, 2012, when plaintiff filed its amended complaint—paragraph 3(K) does not negate Frances A. Rosentreter's full ownership of those tracts earlier, at the time she signed the mortgage, on October 28, 2010.  We agree. When we construe paragraph 3(K) strictly against defendants and liberally in favor of plaintiff (see *Feliciano*, 2014 IL App (1st) 130269, ¶ 30), defendants' right to a partial summary judgment on count IV is not "clear and free from doubt" (*Northern Illinois*

*Emergency Physicians*, 216 Ill. 2d at 306), because paragraph 3(K) identifies only the "present owners" of tracts 1, 2, 3, 5, and 6 and says nothing about who owned the tracts on October 28, 2010, when Frances A. Rosentreter signed the mortgage referenced in count IV.

¶ 140    We realize that, in their motion for reconsideration, defendants presented additional evidence to the trial court. But the trial court was not obliged to consider it. See *Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248 (1991) ("Trial courts should not permit litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling.").

¶ 141                C. Counts XIII, XIV, and XV:  Replevin

¶ 142    Defendants have an ownership interest in tract 1 but not in tract 7. Nevertheless, a grain elevator facility, including 20 grain bins linked together by conveyor belts, straddles tracts 1 and 7, with the property line running through grain bin No. 19.

¶ 143    In counts XIII to XV of the amended complaint, plaintiff sought to enforce a security interest in these grain bins. Count XIII requested possession of the grain bins on tract 1, and counts XIV and XV requested possession of the grain bins on tract 7.

¶ 144    Each of these three counts was entitled "Complaint for Replevin," and each of these counts characterized itself as a "replevin action" and requested "possession of the "collateral," *i.e.*, the grain bins. Because replevin is an action for the recovery of "goods or chattels" (735 ILCS 5/19-101 (West 2012)) and because defendants regard the grain bins as fixtures rather than goods or chattels (but see *Lindstrom v. Houzenga*, 177 Ill. App. 3d 1, 3 (1988) (question of fact whether grain bins were personal property or fixtures)), defendants contend the trial court erred by granting summary judgment in plaintiff's favor on counts XIII to XV and denying summary judgment in their favor on those counts.

¶ 145        On July 26, 2013, however, after entering the summary judgment, the trial court entered a more detailed written judgment, which specifically found that, for purposes of counts XIII to XV, the grain bins actually were "fixtures" and that, as such, they were "part" of the tracts on which they stood.  Therefore, under the heading of "Judgment[:] Count XIII," the court decreed that the grain bins on tract 1 would be "sold as part of said real estate pursuant to the terms of the Judgment of Foreclosure and Sale As to Counts I, II, III and IV."  Likewise, under the headings of "Judgment[:] Count XIV" and "Judgment[:] Count XV," the court decreed that the grain bins on tract 7 would be "sold as part of said real estate pursuant to the terms of the Judgment of Foreclosure And Sale As To Counts V, VI, VII and VIII of Plaintiff's Amended Complaint."

¶ 146        Thus, plaintiff argues that, under the written judgment of July 26, 2013, "the Defendant's allegations and relief sought are moot, as it is clear the grain bins are part of the real estate."  We agree.

¶ 147                    D. The Asserted Waiver or Mootness of the Question
                           of What Tracts 1 and 7 Were Worth Separately

¶ 148        Plaintiff argues that the trial court never determined, and never was asked to determine, the fair market value of any property and that in the evidentiary hearing on apportioning the sale proceeds between tracts 1 and 7, "the fair market value of the subject property was not at issue as the sales had been confirmed," with the agreement of defendants. Thus, plaintiff concludes, "the Defendants' claims [regarding the fair market values of tracts 1 and 7] are improperly before this Court and should be deemed moot."

¶ 149        This reasoning is unconvincing.  Clearly, defendants asked the trial court to determine the fair market values of tracts 1 and 7 for the purpose of apportioning the $9.1 million in sale proceeds between those tracts.  That was the whole point of submitting Akers's appraisals

of those tracts and calling him to testify. And we disagree that by agreeing to a confirmation of the sale *en masse* of tracts 1 and 7, defendants relinquished any issue as to the *individual* fair market values. To say that two pieces of land are worth a certain undifferentiated amount together does not answer the question of how much they each are worth. Defendants could agree with plaintiff that $9.1 million is a fair price for tracts 1 and 7 together without agreeing with plaintiff's proposed apportionment of that amount between the two tracts. Again, plaintiff simultaneously filed two separate motions: a motion to confirm the sale and a motion to apportion $151,666.67 of the sale proceeds to tract 1 and the remaining $8,948,333.03 to tract 7. Defendants agreed with the first motion while opposing the second.

¶ 150                     E. The Apportionment of the Proceeds
                     From the Foreclosure Sale of Tracts 1 and 7

¶ 151          Because the grain elevator facility straddled two adjoining tracts, tracts 1 and 7, the trial court ordered that those two tracts first be offered for sale separately and then be offered for sale together and that if they fetched a higher total bid separately, they would be sold separately, but if they fetched a higher bid together, they would be sold together.

¶ 152          The foreclosure sale was held on November 8, 2013. When tracts 1 and 7 were offered for sale separately, the highest bid for tract 1 was $150,000. (On January 30, 2014, in a hearing on the apportionment of the sale proceeds, Rick E. Rosentreter testified that the highest bidder for tract 1 was plaintiff, but the report of sale says the highest bidder was a third party, Jeff Behme. It is unclear that the report of sale is, properly speaking, evidence. In any event, the identity of the bidder on tract 1 is insignificant to our decision.) The highest bid for tract 7 was $8.85 million, and this was a bid by plaintiff. When tracts 1 and 7 were offered for sale together, the highest bid was $9.1 million, and it was a bid by plaintiff. Because the bid for tracts 1 and 7 when they were offered together exceeded the total of the bids for the tracts when they were

offered separately ($9.1 million compared to $9 million), tracts 1 and 7 were sold together, in accordance with the court's order.

¶ 153 The Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1101 to 15-1706 (West 2012)) does not directly say how the sale proceeds should be apportioned when different tracts of land are sold *en masse*. Nevertheless, as we will explain, it is possible to arrive at an answer to this question by reasoning from section 15-1508(b) (735 ILCS 5/15-1508(b) (West 2012)). We interpret this statute *de novo*. *LaSalle Bank National Ass'n v. Cypress Creek 1, LP*, 242 Ill. 2d 231, 237 (2011).

¶ 154 Section 15-1508(b) provides in part:

"(b) Hearing. Upon motion and notice in accordance with court rules applicable to motions generally, which motion shall not be made prior to sale, the court shall conduct a hearing to confirm the sale. Unless the court finds that (i) a notice required in accordance with subsection (c) of Section 15-1507 [(735 ILCS 5/15-1507(c) (West 2012))] was not given, (ii) the terms of sale were unconscionable, (iii) the sale was conducted fraudulently, or (iv) justice was otherwise not done, the court shall then enter an order confirming the sale." 735 ILCS 5/15-1508(b) (West 2012).

¶ 155 The statute speaks of "the terms of sale." One of "the terms of sale" is the purchase price. *World Savings & Loan Ass'n v. Amerus Bank*, 317 Ill. App. 3d 772, 780 (2000). When several tracts of land are sold *en masse*, there is a single purchase price. And sometimes, because of overlapping improvements or the scarcity of points of entry, tracts of land should be

sold *en masse* to fetch the highest purchase price. *Stone v. Missouri Guarantee Savings & Building Ass'n*, 58 Ill. App. 78, 80 (1894).

¶ 156　　　　But a dilemma could arise. Obtaining only one purchase price for a group of parcels could be problematic because the purpose of a foreclosure is to enforce the payment of the mortgagor's debt (*Resolution Trust Corp. v. Hardisty*, 269 Ill. App. 3d 613, 616 (1995)), and the landowners and the secured debts could be different from one parcel to another (*Brown v. Kennicott*, 30 Ill. App. 89, 90 (1889)).

¶ 157　　　　One possible solution to this problem is to do as the trial court ordered in this case. Give the public advance notice that the tracts of land first will be offered for sale separately and that they afterward will be offered for sale *en masse* and that, when they are offered *en masse*, if the highest bid exceeds the total of the highest bids made when the tracts were offered separately, they will be sold *en masse*, whereas if the total of the highest bids when they are offered separately exceeds the highest bid made when they are offered *en masse*, they will be sold separately. See *Union Trust Co. of New York v. Illinois Midland Ry. Co.*, 117 U.S. 434, 474 (1886). If the tracts of land are sold *en masse*, the sale proceeds could be "divided into *** parts, in proportion to the amounts bid separately on the *** constituent parts, and distributed *** in the same manner as if the *** constituent parts had been sold separately." *Id.* at 474-75.

¶ 158　　　　But what if the highest bid for one of the "constituent parts"—in this case, one of the tracts of land—is unconscionably low even though the winning bid for the tracts *en masse* is quite ample? It is an abuse of discretion to confirm a judicial sale if "the terms of sale were unconscionable." 735 ILCS 5/15-1508(b) (West 2012); see *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 15; *Deutsche Bank National Trust Co. v. Snick*, 2011 IL

App (3d) 100436, ¶ 10. One of "the terms of sale" is the purchase price. *World Savings*, 317 Ill. App. 3d at 780. Defendants did not object to the purchase price for tracts 1 and 7 *en masse*. They had no reason to do so, considering that $9.1 million exceeded Akers's estimate of the fair market value of tracts 1 and 7 ($5,600,00 + $2.875 million = $8.475 million). Nevertheless, even though the sale proceeds from tracts of land sold *en masse* are in a conscionable amount, section 15-1508(b)(ii) (735 ILCS 5/15-1508(b)(ii) (West 2012)) could be subverted by an unconscionable *apportionment* of the sale proceeds between the tracts of land sold *en masse*.

¶ 159        To a mortgagor of tract 1, there is no practical difference between, on the one hand, a sale of tract 1 for only 2.7% of its fair market value and, on the other hand, an apportionment of that amount to tract 1 from a sale *en masse*. The amount the trial court apportioned to tract 1, $151,666.67, was only 2.7% of the fair market value that Akers had placed upon tract 1, $5.6 million. The 2.7% of fair market value, if it would have been unconscionably low in a separate sale, would not somehow be sanitized by a conscionable sale price *en masse*.

¶ 160        Granted, in the absence of mistake, fraud, or a violation of duty by the officer conducting the sale, a trial court should not refuse to confirm a judicial sale merely because the proposed sale price is less than the fair market value of the property. *World Savings*, 317 Ill. App. 3d at 780. It is only to be expected that a forced sale will bring less than the fair market value. *Levy v. Broadway-Carmen Building Corp.*, 366 Ill. 279, 288 (1937). Even so, a court abuses its discretion by confirming a sale when the proposed sale price is "grossly inadequate" and therefore unconscionable. *Id.* at 289; see *Korzen*, 2013 IL App (1st) 130380, ¶ 15. Case law declines to set down a generally applicable percentage of fair market value below which a sale price is unconscionable. *Moeller v. Miller*, 315 Ill. 454, 459-60 (1925). We note, however, that

the appellate court has held approximately 10% of the fair market value to be unconscionable. *JP Morgan Chase Bank v. Fankhauser*, 383 Ill. App. 3d 254, 265 (2008). We conclude that 2.7% is unconscionable.

¶ 161    Just as it would have been an abuse of discretion to confirm a judicial sale of tract 1 for only 2.7% of its fair market value, so was it an abuse of discretion to apportion to tract 1 sale proceeds amounting to only 2.7% of its fair market value when the sale price for the two tracts together exceeded their combined fair market values.

¶ 162    Plaintiff argues, however, that an arm's length transaction validated the offer of $150,000 that plaintiff made for tract 1 (the offer on which the apportionment of $151,666.67 was based). Plaintiff writes: "As the Plaintiff was a willing seller and there were many willing buyers, the sales price yielded at the auction on November 8, 2013, is the best indicator of the fair market value. As a result, the judge's decision to use the arm's length transaction in apportioning the sales price was not against the manifest weight of the evidence."

¶ 163    We see five problems with this argument by plaintiff. First, to be the *seller* of tracts 1 and 7, plaintiff had to *own* them. The mortgagors retained title to tracts 1 and 7 until the trial court entered the order confirming the foreclosure sale and issued the deeds to the purchaser, *i.e.*, plaintiff. See *Kling v. Ghilarducci*, 3 Ill. 2d 454, 460 (1954).

¶ 164    Second—a related point—plaintiff could not possibly be both the seller and the buyer of tracts 1 and 7. When speaking of an arm's length transaction between a willing seller and a willing buyer as being the best evidence of fair market value (*Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228, 230 (1998)), the supreme court surely had in mind two different persons. It is difficult to visualize the contortions of having an arm's length negotiation with oneself.

¶ 165        Third, even when the seller and the buyer at a foreclosure sale are different persons, the property typically sells for less than it is worth.  "It is unusual for land to bring its full, fair market value at a forced sale."  *Levy*, 366 Ill. at 288; see also *Nevada National Leasing Co. v. Hereford*, 680 P.2d 1077, 1080 (Cal. 1984); *Guardian Loan Co. v. Early*, 392 N.E.2d 1240, 1244 (N.Y. 1979); Scott B. Ehrlich, *Avoidance of Foreclosure Sales as Fraudulent Conveyances: Accommodating State and Federal Objectives*, 71 Va. L. Rev. 933, 964 n.91 (1985).  That, indeed, is the attraction of foreclosure sales.  *In re Superintendent of Banks of State of New York*, 100 N.E. 428, 429 (N.Y. 1912).  It is precisely because foreclosure sales tend to bring less than the fair market value that the legislature has provided a right of redemption. One of the purposes of the Illinois Mortgage Foreclosure Law is "to protect the equity of a mortgagor by permitting mortgage redemptions prior to *forced sales*," thereby enabling the mortgagor (if it has sufficient funds) to avoid "the *forced sale* of property at prices well below fair market value."  (Emphases added.)  *Fleet Mortgage Corp. v. Deale*, 287 Ill. App. 3d 385, 389 (1997).  If, as plaintiff argues, the price a property fetched at a foreclosure sale were *ipso facto* the fair market value of the property, that legislative purpose would be superfluous.

¶ 166        Fourth, "[t]he fair market value of property is the amount of money that a purchaser, willing but not obligated to buy the property, would pay *an owner, willing but not obligated to sell the property*, without taking into account the values or necessities peculiar to either party."  (Emphasis added.)  *Hewitt v. Hurwitz*, 227 Ill. App. 3d 616, 622 (1992).  The owners of tracts 1 and 7 were not willing to sell those tracts; rather, they were judicially compelled to do so.  Therefore, the foreclosure sale has no tendency to prove the fair market values of tracts 1 and 7.

¶ 167　　　　Fifth, if a foreclosure sale determined the fair market value of the property, the very term "unconscionable purchase price" would be a self-contradiction. And yet, according to the case law, there is indeed such a thing as a grossly inadequate and therefore unconscionable purchase price in a foreclosure sale. *Levy*, 366 Ill. at 288; *Fankhauser*, 383 Ill. App. 3d at 265. Logic would suggest, then, that the price a property fetches in a foreclosure sale is not conclusive on the question of what is the property's fair market value.

¶ 168　　　　For those reasons, it is incorrect to regard plaintiff's (or, as the case may be, Behme's) bid of $150,000 for tract 1 as evidence of that property's fair market value.

¶ 169　　　　But plaintiff disputes that the appraisals by Akers are a more reliable valuation. Plaintiff claims that his appraisals are "incomplete as [he] conceded that he did not use the income approach when appraising this commercial property and that he was not aware certain structures straddled the property lines."

¶ 170　　　　We are aware of no authority for the idea that an appraisal necessarily is incomplete if it omits the income approach. Plaintiff cites no case laying down a general rule that the income approach is the *sine qua non* of a valid appraisal. Rather, case law prefers the sales comparison approach (*Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43; *United Airlines, Inc. v. Pappas*, 348 Ill. App. 3d 563, 572 (2004)), which Akers used. And he supplemented the sales comparison approach with the cost approach. "Professional appraisals generally employ more than one method to determine valuation; the use of more than one method in a single appraisal serves as a check on the value reached by the other method or methods." *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480 (2008). Akers did that: he used two approaches.

¶ 171        Granted, there would have been no *harm* in including a third approach, the income approach, but unless "the property [was] most valuable as rental property," the income approach would have had only marginal relevance. *Willow Hill Grain, Inc. v. Property Tax Appeal Board*, 187 Ill. App. 3d 9, 14 (1989); see also *Chrysler Corp. v. Illinois Property Tax Appeal Board*, 69 Ill. App. 3d 207, 211 (1979). The record appears to contain no evidence that tracts 1 and 7 were most valuable as rental property. Rather, Akers testified that most commercial grain elevators were owner-operated (and therefore, it would seem, not rented out to others).

¶ 172        In short, the omission of the income approach is insignificant. As for plaintiff's other criticism of Akers's appraisals—that they disregard structures divided by the property line—Akers repeatedly notes, in his written appraisals, that the property line between tracts 1 and 7 runs through grain bin No. 19. He further notes the possibility that the property line also divides the Quonset building: "It is unclear if this building is cut by the property line," he writes. We are aware of no other structures that are, or might be, divided by the property line. Thus, neither of the criticisms that plaintiff levels against Akers's appraisals appears to be valid.

¶ 173        At least Akers's appraisals have the virtue of making sense, whereas apportioning only $151,666.67 of the sale proceeds to tract 1 and the remaining $8,948,333.30 to tract 7 is incomprehensible, given what the appraisals reveal about those two tracts. Tract 1 consists of 70 acres, whereas tract 7 consists of 10 acres. Tract 1 has 3.005 million bushels of grain storage, whereas tract 7 has 1,484,300 bushels of grain storage. Tract 1 has a 15,000-bushel-per-hour receiving pit, whereas tract 7 has a 6,700-bushel-per-hour receiving pit. When one compares these physical characteristics of the two tracts, it is unclear why tract 7 would be worth *59 times more* than tract 1, which is the ratio in which the trial court apportioned the sale proceeds. We

are limited to the evidence in the record, and given that evidence, such an extreme disparity makes no sense.

¶ 174        We conclude, then, that the trial court should have apportioned the sale proceeds in accordance with Akers's unrebutted appraisals of tracts 1 and 7. As an accredited rural appraiser with extensive experience in the valuation of commercial grain elevator facilities, he valued tract 1 at $5.6 million and tract 7 at $2.875 million. The sum of those two amounts was $8.475 million. The fair market value of tract 1 was 66% of that sum ($5.6 million divided by $8.475 million times 100). The actual sale proceeds from the sale *en masse* were $9.1 million. Of those actual sale proceeds, the court should have apportioned $6.006 million to tract 1 ($9.1 million times 0.66) and the remaining $3.094 million to tract 7 ($9.1 million minus $6.006 million). The finding that the foreclosure sale bids proved the property's fair market value was contrary to case law and against the manifest weight of the evidence (see *Hewitt*, 227 Ill. App. 3d at 622), and apportioning only $151,666.67 of the sale proceeds to tract 1 was an abuse of discretion (*cf. Household Bank, FSB v. Lewis*, 229 Ill. 2d 173, 178 (2008) (standard of review applicable to the confirmation of a foreclosure sale)).

¶ 175                    F. Forfeiture of Arguments
                Made for the First Time, on Rehearing

¶ 176        We have addressed all the arguments that plaintiff made in its initial brief, the brief with the blue cover. We note that plaintiff has added some new arguments in its petition for rehearing. For example, plaintiff argues that by consenting to a confirmation of the foreclosure sales, defendants waived their right to appeal the summary judgment on count IV, and plaintiff argues that if we reverse the trial court's apportionment of the sale proceeds between tracts 1 and 7, plaintiff deserves another evidentiary hearing to present its own evidence on the fair market values of those tracts. Defendants are correct that new arguments, such as these, are

forfeited.  "Points not argued" in the initial brief on appeal "are waived"—that is to say, forfeited—"and shall not be raised *** on petition for rehearing."  Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).  This rule applies to appellees as well as to appellants.  Ill. S. Ct. R. 341(i) (eff. Feb. 6, 2013); *Garland v. Sybaris Club International, Inc.*, 2014 IL App (1st) 112615, ¶ 64.

¶ 177                    III. CONCLUSION

¶ 178        For the foregoing reasons, we reverse the trial court's judgment and remand this case for further proceedings.

¶ 179        Reversed and remanded.