NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210683-U

NOS. 4-21-0683, 4-21-0711 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| DARWIN WILSON, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Piatt County |
| RANDEL BEAZLY; BEAZLY | ) | No. 16L13 |
| BROTHERS, INC., an Illinois Corporation, | ) | |
| d/b/a Monticello True Value Hardware; | ) | |
| URMILABEN PATEL; PRAKASHCHANDRA | ) | |
| PATEL; and JAY KESAR GROUP, INC., an | ) | |
| Illinois Corporation, | ) | |
|     Defendants-Appellees, | ) | |
| | ) | |
| (Randel Beazly, and Beazly Brothers, Inc., Defendants | ) | Honorable |
| and Third-Party Plaintiffs-Appellants; N&M Transfer | ) | Adam M. Dill, |
| Company, Inc., and Nor-Lake, Inc., Third-Party | ) | Wm. Hugh Finson, |
| Defendants-Appellees). | ) | Judges Presiding. |

---

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) Summary judgment was proper in favor of the defendants and third-party defendants because plaintiff, as a matter of law, was more than 50% responsible for his injuries.

    (2) The appeal by the third-party plaintiffs is dismissed as moot.

¶ 2    Plaintiff, Darwin Wilson, suffered injuries when a 1500-pound walk-in cooler he delivered to a Dairy Queen in Monticello, Illinois (DQ), fell. Plaintiff brought a negligence claim seeking damages from Beazly Brothers, Inc., and Randel Beazly (collectively Beazly

defendants), who attempted to help remove the walk-in cooler from plaintiff's trailer with a forklift, and the owners of the DQ, Urmilaben Patel (Urmila), Prakashchandra Patel (Peter), and Jay Kesar Group, Inc. (collectively Patel defendants). The Beazly defendants filed a third-party complaint for contribution against plaintiff's employer, N&M Transfer Company, Inc. (N&M Transfer), and the manufacturer of the walk-in cooler, Nor-Lake, Inc. (Nor-Lake). The trial court ultimately granted summary judgment against the Beazly defendants on their counterclaim upon finding, in part, no evidence the conduct of N&M Transfer and Nor-Lake proximately caused plaintiff's injuries. The court also granted summary judgment against plaintiff in favor of all defendants upon concluding plaintiff, as a matter of law, was more than 50 percent at fault for his injuries. Both plaintiff and the Beazly defendants filed appeals, which were consolidated for our review.

¶ 3        On appeal, plaintiff argues the trial court erroneously (1) ruled on the issue of comparative negligence, an issue he contends that is reserved for the factfinder; and (2) applied the open-and-obvious doctrine to a case of ordinary negligence. The Beazly defendants not only dispute plaintiff's aforementioned contentions but also maintain the court erred by finding no genuine issue of material fact on the question of whether the actions of Nor-Lake and N&M Transfer were a proximate cause of plaintiff's injuries.

¶ 4        We affirm.

¶ 5                                I. BACKGROUND

¶ 6        In 2014, the Patels ordered a Nor-Lake walk-in cooler to be installed into their DQ. (Note the terms "walk-in cooler" and "freezer" are used interchangeably in this case.) On October 29, 2014, plaintiff, a truck driver for N&M Transfer, was tasked with driving the cooler

to the DQ. Because the Patels were not aware they were to arrange for the removal of the cooler from plaintiff's trailer, no one was prepared to remove the cooler when plaintiff arrived. The walk-in cooler weighed over 1500 pounds. Its dimensions were approximately 8 feet long, 4 feet wide, and 6 feet tall. Plaintiff suggested seeking assistance from the neighboring True Value hardware store. Randel, an owner of Beazly Brothers, Inc., which owned and operated the True Value, agreed to assist with the cooler's removal. Randel arrived at the DQ with a forklift.

¶ 7        On his first attempt, Randel could not remove the walk-in cooler. The length of the shipping crate was too long for the forklift. Plaintiff suggested a technique, loosely described in this case as the "pallet maneuver," which would permit the forklift to lift the cooler from the side. In this maneuver, plaintiff directed Randel to pull the cooler approximately three-quarters out of the trailer. One quarter of the cooler remained on the trailer floor and the remaining three quarters were supported by a pallet that was set on its side. Per plaintiff's direction, Randel attempted the side approach. During this procedure, the cooler fell, injuring plaintiff.

¶ 8                          A. The Pleadings

¶ 9        Plaintiff filed this negligence action in September 2017 against the Beazly defendants, the Patel defendants, and American Dairy Queen Corporation. In his pleadings, plaintiff alleged Randel was negligent by failing to (1) operate the forklift in a safe manner and with reasonable care, (2) unload the cooler properly, and (3) determine the cooler could be unloaded safely with his forklift. As to the Patel defendants, plaintiff alleged they were negligent in that (1) they accepted delivery of freight without having proper equipment, (2) requested Randel's assistance without determining if the cooler could be safely removed, (3) failed to obtain the necessary equipment to unload a commercial freezer, and (4) sought the assistance of

an unqualified individual to unload the freezer.

¶ 10      The Beazly defendants pursued a contribution claim via a third-party complaint against N&M Transfer and Nor-Lake. The Beazly defendants alleged N&M Transfer was negligent in that it failed to (1) provide a safe workplace for plaintiff, (2) train plaintiff on how to unload or move heavy items, (3) provide plaintiff with proper equipment, (4) give notice to the Patels of the need to have equipment for the safe unloading of the cooler, and (5) inform those attempting to move the cooler the load was out of balance or difficult to unload. Regarding Nor-Lake, the Beazly defendants alleged the manufacturer failed to (1) properly palletize or crate the load for delivery, (2) prepare a load that was safely balanced, (3) inform the parties the load was unbalanced, and (4) give notice of the need for proper equipment to safely unload the cooler.

¶ 11      In September 2020, American Dairy Queen Corporation and plaintiff reached a settlement agreement, which was approved by the trial court the following month. American Dairy Queen Corporation is not part of this appeal.

¶ 12                              B. Deposition Testimony

¶ 13                                  1. Fred Otten

¶ 14      Fred Otten, owner of Frosty Refrigeration in Urbana, Illinois, testified he was asked by the Patels to help them purchase a walk-in cooler for the DQ. Otten, who had performed service work for the Patels, chose a cooler manufactured by Nor-Lake. Otten ordered the cooler from Nor-Lake and was later contacted by Nor-Lake with a shipping date. Otten then called the Patels to inform them of the shipping date. He also told them they were responsible for unloading the cooler from the delivery truck and would probably need a forklift to do so.

¶ 15                                  2. Peter Patel

¶ 16            One or two days before the cooler was delivered, Otten called the DQ to inform the Patels the freezer was arriving on October 29, 2014. Otten did not tell Peter to be prepared for a large shipment. Peter did not know the cooler's weight or the equipment needed to unload it. Peter believed Otten was taking care of everything.

¶ 17            Plaintiff did not call the Patels before his arrival. Plaintiff arrived at the DQ and talked to Urmila, Peter's wife. Plaintiff told Urmila to get the forklift from True Value. Urmila agreed and went to the True Value. Plaintiff went with her. The Patels knew Randel "[a]s a business neighbor." Before October 29, 2014, the Patels had not asked Randel for use of his forklift.

¶ 18            By the time Randel arrived with the forklift, plaintiff had moved the cooler a "little bit out on the edges of the truck." Plaintiff instructed Randel: "go up, left, right, whatever he was saying." Randel followed the directions. Twenty to twenty-five percent of the freezer was out of the truck. Plaintiff told Randel to put the forks under the cooler. Plaintiff then "put some pallet block that comes under the pallet." At this point, most of the cooler was on the truck and the pallet, which plaintiff placed under the cooler, supported the other side. Peter "heard the sound to break that wood." The pallet and cooler fell. As Peter was not on the same side of the cooler as the forklift was, Peter did not know if the forklift was touching the cooler when it fell.

¶ 19                                  3. Urmila Patel

¶ 20            Urmila testified when plaintiff spoke to Urmila in the DQ parking lot, he told her he did not have a liftgate. When asked about True Value, Urmila said, "[H]e told me, can we go over there?" At the hardware store, Urmila asked Randel if he could use the forklift to assist. Randel initially refused saying it was risky. Plaintiff asked Randel to "please let us because they

had no other equipment." Randel agreed and took the forklift to the truck. At this point, Urmila went inside the restaurant and did not see the cooler fall.

¶ 21                             4. Darwin Wilson, plaintiff

¶ 22        Plaintiff testified he began working for N&M Transfer in August 2007. N&M Transfer was based in Neenah, Wisconsin, and had a hub in Normal, Illinois. For N&M Transfer, plaintiff was a "peddler" driver, who made "stop to stop to stop." Plaintiff made deliveries to customers from the Normal hub. He was paid "by the load and the stop" and "miles," and the work was "pretty steady." Ninety percent of the time N&M Transfer did not have trailers with lift gates. When asked about the training by N&M Transfer, plaintiff said he was driven around by "their people" and was shown "how to unroll, unhook *** and all that stuff." N&M Transfer drivers were also trained for HazMat. When asked about N&M Transfer rules on assisting a customer in unloading a load, plaintiff testified "we always had to make an attempt to make the *** stop." According to plaintiff, "Most of the time we didn't do anything, but probably 70 percent of the time we were outside unloading, so we had to bring it to the back of the trailer and assist getting it off the back of the trailer."

¶ 23        Plaintiff first learned he would be driving the cooler to DQ the morning of October 29, 2014. The bill of lading he received for that delivery indicates the walk-in cooler weighed 1583 pounds. The refrigeration unit weighed 414 pounds. The larger unit was "crated up;" the refrigeration unit was in two boxes. The bill of lading further contains a direction to "call two hours prior to DEL." Plaintiff was not aware of that direction. When he received the bill of lading, he only looked at the destination, "not what was on the paper."

¶ 24        According to plaintiff, the trailer that day did not have a lift gate. Plaintiff had his

own pallet jack with him and a two-wheel dolly. The pallet jack's weight capacity was 5000 pounds. N&M Transfer did not provide equipment for unloading the trailer. Plaintiff agreed most fast-food establishments did not have loading docks.

¶ 25    The day of the incident was a "sunshiny day." He arrived at the DQ around 9:45 a.m. Plaintiff had not called the DQ or the Patels before his arrival. No one was at the DQ when he arrived. Plaintiff planned to put a note on the door of the DQ regarding the attempted delivery and leave but then the owners arrived.

¶ 26    Plaintiff informed the owners he had a delivery. Urmila told plaintiff to place the cooler by the back door. Plaintiff responded the cooler was big and he could not simply put it at the back door. Urmila asked him to disassemble the cooler. Plaintiff then showed her the crated cooler and said he could not do that. The unit was at least six feet tall, three to four feet wide, and at least eight feet deep. The freezer "was on runners but they call them pallets." Plaintiff described the "runners" or "pallet" it sat upon as "three 4 x 4s," which were "probably" connected to the bottom of the wood crate. There was a 4 x 4 on each side and "one running down the middle." There were not straps on the cooler unit, no stickers indicating the item was "top heavy," and no warnings on the crate.

¶ 27    Because plaintiff had made a delivery to the hardware store next door to the DQ, he knew they had a forklift. Plaintiff suggested to Urmila they go there to see if they would help. If he could not get a forklift, plaintiff planned to "[p]ut it back on the wall and take it back to Neenah, tell them they'd have to get some help." Plaintiff did not remember having any discussion with Urmila about using a loading dock in Monticello to get the cooler off his trailer.

¶ 28    Plaintiff testified Urmila went to True Value and returned 5 to 10 minutes later

with Randel and his forklift. Plaintiff did not know if Randel had forklift experience. Plaintiff did have experience using a forklift. "Way back when," plaintiff held a job that required him to use one and he, as recently as a month earlier, had used a forklift.

¶ 29   Inside the trailer, plaintiff used his pallet jack to move the freezer toward the rear of the trailer. Moving it "was rough." The "pallet jack [was] only about yay long, and that was so long when you pick it up, it tilted this way, so you had to scoot it to the back." When asked if he learned the cooler was top heavy while using the pallet jack, plaintiff replied he had not. When asked if he was "aware that the weight of the freezer was not evenly distributed" or "appeared to be heavier at one point than [at] another point," plaintiff responded, "Not really, no." Moving the cooler was difficult because it was long.

¶ 30   When Randel arrived, plaintiff told him to "see if you can unload it." Randel inserted the forks under the crate and lifted it. Plaintiff could not remember how long the forks were, but they were shorter than the length of the cooler. Plaintiff agreed "strapping a load to the forklift tines" is "sometimes done when necessary." There were no discussions between Randel and plaintiff regarding the cooler's weight. The forklift appeared to be large enough to handle removing the cooler from the trailer. When it was lifted about two feet off the ground, the cooler tilted forward. Plaintiff believed the tilt was due to the length of the forks. Had the forks been longer, the tilting issue would have been solved. Once the walk-in cooler tilted, Randel put the cooler back on the floor of the trailer.

¶ 31   Randel and plaintiff then discussed how to get the cooler from the trailer. Plaintiff suggested pulling the freezer out further and then "put something under the end of it, stabilize it, and then come from the side." Plaintiff had used this maneuver (the "pallet maneuver") "[m]any

times." In this plan, plaintiff envisioned moving the freezer more than halfway out of the trailer, and plaintiff agreed "that way the forks could be placed so it would be completely or largely underneath the whole unit so it wouldn't tilt." Randel had a pallet at True Value. Plaintiff grabbed it. Plaintiff agreed a pallet was "2 x 4-inch high with slats on the top and bottom." Plaintiff would stand the pallet on its end. Plaintiff agreed there would have been a slight difference between the height of the pallet and the end of the trailer. The pallet was in good shape. When plaintiff verbally communicated his idea to Randel, Randel did not object. When asked if he recalled Randel suggesting they take the load to Illini FS where they had a loading dock and unload it there, plaintiff responded, "No, I don't remember that." He could not remember Randel voicing any objections to the plan.

¶ 32    As Randel used the forklift to move the cooler, the front of the cooler was lifted a few inches. The rear of the cooler was dragged along the floor. The forklift did not appear to be straining. The cooler was "right where [plaintiff] wanted it," three-fourths out of the trailer. The forklift had disengaged and pulled away. It appeared that the cooler was stable as it sat on the pallet.

¶ 33    The next step would have been for Randel to drive to the side of the cooler and reengage the forklift from the side. Randel inserted the forks and began to lift the cooler. It began to tilt away from the forklift toward plaintiff. The cooler was "tilting more from the back." Plaintiff suggested they set the cooler down as he "thought it was more heavy on the other side, which was making it go this way." At that point, plaintiff "made [Randel] come around to the other side." Plaintiff wanted the heavier side nearest to the forklift. Plaintiff believed, based on the way the load was tilting, that side was heaviest. Plaintiff and Randel talked very little.

Plaintiff stated, "I was making most of the suggestions." Randel drove the forklift to the other side. When he got the forks under, plaintiff told him he was "all the way under" and then Randel lifted the load. The forks were "[j]ust a little short." At this point, the cooler began tilting the other way. Plaintiff walked around to the side opposite of Randel, put his hands up, and that was "the last [he] remember[ed]."

¶ 34    If it had not fallen, plaintiff's plan was to put the cooler back on the trailer if the side did not work. When asked if neither side worked "because it was top heavy rather than side heavy," plaintiff responded, "I never knew it was top heavy."

¶ 35    Plaintiff learned the pallet maneuver from watching other drivers, not N&M Transfer drivers. No one from N&M Transfer taught him that maneuver. Plaintiff did not contact N&M Transfer to advise them he was getting any assistance in unloading the trailer. Plaintiff had not received any instructions or training by N&M Transfer to instruct him what to do when confronted with a load without a lift gate and without a loading dock. Plaintiff said he "was always told that I had to make an attempt to deliver, so that's what I tried to do. I tried to attempt to deliver, and if I couldn't have delivered it, it would have went back up north." Plaintiff believed he was following instructions from N&M Transfer in attempting to deliver the load. He also agreed an "attempt" would have been made if a note was left on the door telling them to arrange for delivery at another time and plaintiff's pay would not have been affected. Plaintiff stated he received a training manual from N&M Transfer after he was hired. Plaintiff had the pallet jack and the dolly to help him move stuff. N&M Transfer did not require either of those items.

¶ 36    Plaintiff did not look at the weight before attempting to deliver it. He simply

knew it was heavy. "Looking back on it now, do you believe the load fell because it was top heavy?" Plaintiff responded, "Now I do, yeah." Plaintiff knew there was a loading dock approximately three blocks from DQ. He did not think of taking the load there.

¶ 37        Plaintiff testified if he had straps, he would have used them to move the cooler. Straps would have prevented the tilt. He had some straps on his truck but not the kind to use to strap a load to the forklift.

¶ 38                            5. Randel Beazly

¶ 39        Throughout Randel's deposition, the attorneys and Randel incorrectly referred to the date of the incident as November 6, 2014. The record establishes the date was October 29, 2014. In the summary of Randel's deposition, to avoid confusion, the date has been changed to the correct date of the incident.

¶ 40        Randel and his parents formed the Beazly Brothers corporation to open a hardware store in Monticello. Randel was trained to use a forklift with a manual through the Midwest Hardware Association. Randel also trained individuals that were authorized to use True Value's forklift. On October 29, 2014, Randel was in the office when plaintiff and the Patels entered his store. Plaintiff asked Randel if he could help him unload an item from the back of his truck. Randel told the Patels he would unload the product for $15. Randel understood, after unloading the cooler, he would place it on the ground next to their store.

¶ 41        Randel arrived at the DQ with the forklift. He inserted the forks and attempted to tip back the cooler so he could have the whole load on the forklift. The load wanted to tip forward back into the truck. Randel stopped with the plan and "set it up into the truck." Randel told plaintiff he could not unload it. Plaintiff told Randel "he does this all the time, and he could

tell [Randel] how to do it." Plaintiff said he would take full responsibility for it and would direct Randel. Randel told plaintiff he would rather they take it to "FS" where they had a loading dock and they would unload it with a bigger forklift with longer tines. Randel said he told plaintiff he would then get a small trailer and take the cooler to the DQ. FS was approximately two blocks from DQ. Randel owned stock in the FS location. FS had "always offered that if I ever needed anything unloaded, to bring it over." In the past, FS had brought a forklift to move items at True Value.

¶ 42 Plaintiff did not want to take the cooler to FS. Randel did what plaintiff asked. Randel pulled six feet of the walk-in cooler out of the trailer and stopped when plaintiff told him to stop. As the cooler sat on the forklift, plaintiff grabbed a pallet from True Value and put it under the end where the forklift was and had Randel lower the cooler onto the pallet. It was just one pallet, and it held the load. Plaintiff told Randel to back out and approach the cooler from the side. Randel knew the length and width and height of the load. He knew it contained a freezer. Plaintiff told him to see if he could pick up the freezer from the middle. Plaintiff wanted him to tip it toward Randel but it began to tip in the other direction. Randel set it back on the pallet. Everything was stable. Randel agreed they still could have put the freezer back on the truck. Plaintiff, however, asked him to try the other side.

¶ 43 On the "other side," there was a curb and Randel could not "get square with the crate." Plaintiff told Randel "to push the crate with the forklift so that it would square up into my tines or the forks." Plaintiff continued to tell Randel "to push, push, and it slowly got squared up." Plaintiff had Randel begin to lift. Randel began to tilt the tines to bring the freezer toward him but it began tipping the other way. Plaintiff went to the side where it was tilting and the

freezer fell, striking plaintiff. The cooler began to tip away; "[i]t was top heavy."

¶ 44 Randel testified the forklift was in good operating condition. It was used once a week for deliveries. True Value did not have forklift extenders. The two forks on the Beazly forklift were not the same length. There was a "slight difference" between the two.

¶ 45 Someone from N&M Transfer conversed with Randel after the accident. According to Randel, they apologized and said the truck that was delivering the crate was supposed to have a lift gate. When asked to explain why he believed the load was top heavy, Randel stated when he tilted the forks back, the crate should have tilted back with the forks but it wanted to go the opposite direction and it did that from both sides. There was nothing on the crate to indicate the weight of the freezer. There were no forklift pockets. There were just rails. The Patels heard Randel suggest unloading the freezer at FS and were "fine with that." Randel testified the pallet did not crack or break. Randel did not know if longer forks on his forklift would have kept it from tipping or not.

¶ 46 Randel stated that plaintiff seemed "in a hurry wanting to get to the next job." Plaintiff was not yelling "but it was a little bit stronger than normal conversation." A load does not need to be tall for it to tip if it is lifted when the load is "much longer than the tines." Randel stated when he approached from the side his forks "reached to the other side."

¶ 47 6. Mike Roth, N&M Transfer

¶ 48 Mike Roth, the director of operations for N&M Transfer, testified N&M Transfer employed over 400 truck drivers. Plaintiff was hired in approximately 2007 to work as a truck driver out of a relay station in Bloomington, Illinois. Plaintiff was a peddler driver, or day driver, who completed deliveries and pickups to and from customer locations. A line-haul driver shuttles

freight between Bloomington, Illinois, and the terminal in Neenah, Wisconsin.

¶ 49        When a driver was hired, that driver went through a three-day orientation. General policy, HazMat, log training, and administrative matters were covered. After orientation, drivers were assigned to have a driver trainer ride along with them.

¶ 50        Roth testified the instructions for unloading large items, such as a walk-in freezer, were "if you can't unload something safely, call your dispatcher for direction." When asked how one would know what was safe and what was unsafe, Roth responded, "Common sense." Roth stated the variety of items were too diverse to permit training on how to handle each piece of freight. If he had any safety concerns, plaintiff was to report those concerns to his supervisor immediately. Plaintiff had a phone with him.

¶ 51        Roth agreed N&M Transfer had transported product for Nor-Lake over a number of years. There was no training for the drivers in loading or unloading walk-in coolers. When asked if Nor-Lake provided training on these matters, Roth testified, "Nor-Lake's direction was that we follow the instructions on their bill of lading." When asked how a Nor-Lake walk-in cooler gets from the place of manufacture to Neenah, Wisconsin, Roth explained a shipment would be called for pickup and a dispatcher would send a pickup driver to load the outbound freight. Someone would go to the Nor-Lake dock and the freezer would be loaded on the trailer. The driver would watch as that item was loaded and then sign the bill of lading acknowledging receipt. The driver would take it to the Neenah terminal, where it would be unloaded by forklift and put in a warehouse. It would then be reloaded onto a delivery driver's trailer. A line haul driver would take it to Bloomington and a day driver would deliver it to a customer.

¶ 52        There would be no planning on off-loading goods at the ultimate destination as

the customer had the responsibility to receive what was ordered. Regarding the delivery of the cooler to DQ, N&M Transfer did not learn the Patels did not have the ability to off-load the cooler until after plaintiff was injured. Although N&M Transfer consistently transported Nor-Lake goods from 2007 to 2014, plaintiff had no training how to unload their freezers because "that's not something [N&M Transfer] would expect him to do." There was no expectation for him to do that because the cooler is "too big and bulky to handle safely."

¶ 53        Roth testified how Nor-Lake wanted to handle customer deliveries:

"Typically going to job sites, we'll hold them and call for a delivery appointment to make a pre-advanced call to make sure that there's a way for them to receive the product, find out when they would be available. In this case[,] the shipper told us [']do not do that, we will have that arrangement taken care of, just make sure you follow the bill of lading instructions.['] In this case, it was call two hours prior to delivery."

¶ 54        N&M Transfer began handling Nor-Lake business in higher volume several months before the incident. N&M Transfer began encountering situations where they would arrive and a driver would say they were not able to unload Nor-Lake's freight, and they would have to redeliver it. This "happened several times to the point where we reached out through our sales rep to Nor-Lake to ask them, we—we want to hold your shipments to make delivery arrangements prior to the delivery." Nor-Lake did not want to use that approach, telling N&M Transfer, "we will just make sure that we do a better job of ensuring that that is done and just follow the bill of lading information for the delivery." Roth agreed plaintiff had no knowledge of

this issue between Nor-Lake and N&M Transfer.

¶ 55   It was a common situation for N&M Transfer drivers to arrive at a location to make a delivery and a dock was not available. Generally, drivers are told if there is no dock and they can move the freight to the tail safely, take the freight to the tail. If the customer has no way to get the freight from the truck, the driver can remove it from the truck and out of the weather if it is something that could be done safely. Roth used the example of a skid of boxes of diapers. That driver could break the shrink wrap and use a two-wheel cart to transport it to the customer. It was common for drivers to help customers unload freight. Roth stated, in the case of a cooler, it cannot be safely moved without a dock. Dispatch should be called. In instances when freight cannot be safely removed, the driver should contact the dispatcher, who would contact the supervisor. The supervisor would then reach out to the customer support representative who would contact the customer, which in this case was Nor-Lake.

¶ 56   Roth was asked about a checklist completed by plaintiff in June 2013, which was "an index of [plaintiff's] driver's qualification file." On this form, N&M Transfer asked drivers if they used forklifts at the locations of their customers. Plaintiff indicated he did not. Had he said he had, forklift training would have been provided for plaintiff at no cost.

¶ 57   Roth testified 35 of their trailers had lift gates. N&M Transfer owned 300 to 350 and leased 60 to 80 more trailers. When asked if a liftgate could have been used in this case, "a 12-foot pallet" would have been too large for a liftgate. Roth stated a dock or a forklift with fork extensions was necessary to remove the cooler as the pallet was nine feet long and the forks on a forklift are generally only 4 feet long. Roth did not know if the load was top heavy.

¶ 58       7. Keith King, N&M Transfer

¶ 59    Keith King, a driver trainer for N&M Transfer, testified he was involved in plaintiff's training in 2007. Safety was "an important aspect of an employee's job." When asked what training plaintiff would have received regarding unloading large items, King stated plaintiff would have been told to seek help if he could not move the item physically by himself. Plaintiff also would have been told to call dispatch for further instruction if the freight could not be safely removed from the trailer. In handling freight, drivers were advised to purchase a pallet jack to help move it to the rear of the trailer. Drivers were instructed regarding lifting techniques, not grabbing freight by straps, and not pulling freight backwards. No training was provided regarding operating a forklift. "At times," drivers engaged in loading and unloading freight.

¶ 60    Day drivers were trained to review the bills of lading before transporting items. This was to look for any special instructions for each delivery. Bills of lading do not have information regarding how to load or unload a product. That was left to the driver's common sense. All bills of lading indicated the weight of the pallet being shipped.

¶ 61    King was aware of the pallet maneuver that plaintiff used when unloading the Patels' cooler. He had "seen other people do it," and stated, "it's a very stupid maneuver." When asked whom he had seen use the "pallet maneuver," King testified: "Well, I [had] seen other people, not—you know, we're an LTL company so we're at several different locations; and I've seen other drivers attempt to do this with freight. Sometimes they're successful; sometimes they're not. It's not a safe way to take freight off a trailer."

¶ 62    King opined load bars, straps, flashlights, handcarts, and pallet jacks would not "have anything to do with unloading that freezer off of the trailer." If a driver could not safely unload freight, the driver would call dispatch and not lose pay for staying safe.

¶ 63                                    8. Timothy Myers, Nor-Lake

¶ 64          Myers, a former environmental health and safety manager for Nor-Lake, testified

he was responsible for the people, procedures, and operations at Nor-Lake. Myers had a role in

ensuring a shipment could be loaded and unloaded safely. Myers participated with management

in identifying proper palletization and ensuring loads would be balanced and safely handled

within the Nor-Lake facility and safely loaded onto and unloaded from freight trucks. Myers did

not control the palletization of a load but participated in assuring the correct process was in place

to make sure that occurred. Decals were placed on some of the pallet loads to ensure safe

handling and prevent damage to the products. Employees were also trained in how to handle the

loads. Basic industry standards regarding palletization and product shipment were followed.

¶ 65          Myers testified regarding a photo of a walk-in cooler of the type that fell on

plaintiff. That cooler was placed on a customized pallet, designed by someone at Nor-Lake. The

pallet was made of wood. Pallets were slats of wood the product was placed on. The wood slats

were not designed to prevent tilts but to keep the panel together structurally. Myers agreed that

one of the purposes of the bottom panel on the pallet was to stabilize the load as it is moved with

a forklift. When he worked at Nor-Lake, Nor-Lake did not manufacture pallets that did not have

bottom panels. Myers began working for Nor-Lake in January 2018. Myers believed pallets built

in 2014 were of the same style as the one built while he worked at Nor-Lake. Myers testified the

pallet with a bottom panel would allow the freight to be picked up from the front or the side. A

pallet that had only runners would allow it to be picked up from the end only. Having runners on

the ground in itself did "not predicate that one is better than the other necessarily[;] it's all

dependent on how you're going to handle the load." Nor-Lake would not ship an eight-foot

- 18 -

walk-in cooler with a pallet that just had runners.

¶ 66        Myers testified the packaging instructions were loosely outlined in the pallet blueprint to show what the pallet would hold. Myers believed the employees were trained how to correctly stack items on the pallet. Nor-Lake would not have shipped a product that was heavier on one side. N&M Transfer would have broken that down to two loads. Nor-Lake did not have top-heavy decals or warning labels because no loads were to be top heavy. Nor-Lake did not ship top-heavy loads as they were dangerous.

¶ 67        Myers testified the bill of lading on the Patels' cooler indicates the document was shipped from Nor-Lake on October 28, 2014. The bill of lading states, "Carrier call two hours prior to delivery" and a phone number was listed. The purpose to call two hours before was to notify the purchaser to insure they had a proper way to unload the product. This was not always for safety reasons but there had been "an extreme amount of product damage." It was N&M Transfer's responsibility to identify a safe way to unload the walk-in cooler.

¶ 68        Myers agreed information on how to safely unload the walk-in cooler was not contained on the bill of lading. Myers reasoned no more information was provided as Nor-Lake could not control the environment or the equipment or foresee what a freight-delivery company may have available.

¶ 69                            C. Summary Judgment

¶ 70        Multiple motions for summary judgment were filed. Both Nor-Lake and N&M Transfer moved for summary judgment against the Beazly defendants. Nor-Lake asserted summary judgment was proper because (1) Nor-Lake owed no duty of care to plaintiff or Randel as to the physical act of unloading the walk-in cooler, (2) the risks of unloading the walk-in

cooler were open and obvious, (3) any alleged breach by Nor-Lake of a duty of care was not the proximate cause of plaintiff's injuries given the unforeseeability of the method plaintiff chose to off-load the walk-in cooler, and (4) plaintiff's comparative fault was greater than 50% as a matter of law. N&M Transfer asserted similar arguments, including the absence of proximate cause and plaintiff's comparative fault was greater than 50%.

¶ 71        The American Dairy Queen Corporation also moved for summary judgment, and the Beazly defendants moved to adopt the corporation's comparative-fault argument in its own motion for summary judgment. Later, the Patel defendants adopted the American Dairy Queen Corporation's motion for summary judgment as well. In that summary-judgment motion, the American Dairy Queen Corporation argued this is one of the rare cases where the facts lead to the "inescapable conclusion of overwhelming comparative negligence on the part of the plaintiff that a court can find the plaintiff is not entitled to a recovery as a matter of law."

¶ 72        In October 2020, a hearing was held on the summary-judgment motions. At the end of the hearing, the trial court, Judge Finson presiding, ruled on the summary-judgment orders. The court found the following, regarding Nor-Lake's motion for summary judgment: "I don't think there's any genuine issue of material fact but that the plaintiff's injury was caused by the plaintiff's own fault. Plaintiff was more than fifty percent responsible for his injuries. Nothing Nor-Lake did contributed in any way to his injuries. So the motion—Nor-Lake's Motion for Summary Judgment will be granted." Regarding N&M Transfer's motion, the court reached the same conclusion:

> "I don't think there's any genuine issue of material fact but
> that there was no evidence of any act or omission on N&M's part

- 20 -

that proximately caused the injury. Plaintiff's decision to proceed

with the forklift off-load and pallet maneuver and to decline the

alternate of using the loading dock at the FS Plant, and his failure

to call dispatch were the proximate and legal cause of the injury.

So N&M's motion for summary judgment is also granted."

¶ 73    For the summary-judgment motion filed by the Beazly defendants, the court

adopted basically the same ruling. The court found plaintiff "sadly, was more than fifty percent

at fault." At this time, the Patel defendants had not yet adopted the American Dairy Queen

Corporation's summary-judgment motion. That was not filed until November 2020. At the close

of the summary-judgment hearing, the trial court directed N&M Transfer to draft a written order.

¶ 74    In December 2020, N&M Transfer filed a motion for clarification. N&M Transfer

noted it had been directed to draft a written order but stated, "The attorneys' notes as to the

content and bases of the Court's rulings on October 21st are apparently contradictory." N&M

Transfer asked the trial court to sign its draft order or revise it consistent with the verbal ruling.

¶ 75    Before a written order was entered, Judge Finson retired. In January 2021, Judge

Dill was assigned to this case. Judge Dill, in June 2021, signed a written order on the

summary-judgment and motion-to-adopt motions. In the written order, the trial court entered

summary judgment for N&M Transfer and Nor-Lake "for the reasons stated on the record." It

did the same for the motions to adopt filed by the Beazly defendants and the Patel defendants.

¶ 76                                  D. Motion to Reconsider

¶ 77    Plaintiff filed a motion to reconsider, which the trial court, Judge Dill presiding,

denied. The court ruled it "[found] no error in Judge Finson's analysis of the facts and legal

- 21 -

theories in this case." The court observed plaintiff, in its motion to reconsider, provided no newly discovered evidence, cited no relevant changes in the law, and failed to present any error in Judge Finson's application of the existing law.

¶ 78    Both plaintiff and the Beazly defendants filed separate appeals in this case. The appeals were consolidated for our review.

¶ 79                                   II. ANALYSIS

¶ 80                   A. Background Law and Standard of Review

¶ 81    To recover damages on his claim of negligence, plaintiff must allege and prove the defendants owed a duty to the plaintiff, the defendant breached that duty, and the breach was a proximate cause of the plaintiff's injuries. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 256, 720 N.E.2d 1068, 1071 (1999).

¶ 82    Although a drastic means to resolve litigation (see *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 9 (2008)), summary judgment is proper when pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmovant, demonstrate no genuine issue of material fact and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020); *Pontiac National Bank v. Vales*, 2013 IL App (4th) 111088, ¶ 29, 993 N.E.2d 463 (quoting 735 ILCS 5/2-1005(c) (West 2008)). When material facts are disputed or where material facts are undisputed but reasonable persons may make differing inferences from those facts, a triable issue precludes summary judgment. See *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162-63, 862 N.E.2d 985, 991 (2007). Only when the moving party's right to summary judgment is clear and free from doubt should summary judgment be permitted. *Williams*, 228 Ill. 2d at 417. While, generally, negligence cases present

- 22 -

questions for a trier of fact that preclude summary judgment (see generally *Johnson v. Colley*, 111 Ill. 2d 468, 475, 490 N.E.2d 685, 688 (1986)), nothing in the language of section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2020)), prevents its application to negligence claims (*Rettig v. Heiser*, 2013 IL App (4th) 120985, ¶ 33, 996 N.E.2d 1220). When a defendant moves for summary judgment, the plaintiff must present evidence of the defendant's negligence and evidence that negligence was the proximate cause of the plaintiff's injuries. *West v. Kirkham*, 207 Ill. App. 3d 954, 958, 566 N.E.2d 523, 525 (1991). We review summary-judgment orders *de novo*. *CNB Bank & Trust, N.A. v. Rosentreter*, 2015 IL App (4th) 140141-B, ¶ 120, 39 N.E.3d 337.

¶ 83                                    B. Comparative Negligence

¶ 84        Plaintiff argues the trial court improperly found the plaintiff more than 50% at fault for his injuries as a matter of law. In asserting this argument, plaintiff initially suggests the use of the term "trier of fact" for determining the issue of comparative negligence in section 2-1116(c) of the Code of Civil Procedure (735 ILCS 5/2-1116 (West 2020)) prevents bypassing this determination through summary judgment.

¶ 85        We are not persuaded. Section 2-1116(c) provides the following, in part:

            "In all actions on account of death, bodily injury or

            physical damage to property in which recovery is predicated upon

            fault, the contributory fault chargeable to the plaintiff shall be

            compared with the fault of all tortfeasors whose fault was a

            proximate cause of the death, injury, loss, or damage for which

            recovery is sought. The plaintiff shall be barred from recovering

- 23 -

damages if *the trier of fact* finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damages for which recovery is sought." *Id.* (emphasis added).

In *West*, 207 Ill. App. 3d at 958, an appeal from a summary-judgment order, this court observed a plaintiff's contributory negligence may become a question of law in the right circumstances: "Ordinarily, the question of contributory negligence is a question of fact for the jury, but it becomes a question of law when all reasonable minds would agree that the evidence and reasonable inferences therefrom, viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." At the time *West* was decided, the same "trier of fact" language appeared in an earlier version of section 2-1116. See Ill. Rev. Stat. 1991, ch. 110, ¶ 2-1116. The "trier of fact" language does not, in itself, preclude summary judgment.

¶ 86        Plaintiff further argues the trial court improperly viewed plaintiff's conduct in a vacuum and ignored the evidence of "potential" negligence by all of the parties.

¶ 87        We are not convinced. In the comparative-fault analysis specified in section 5-2116, one is to compare "the contributory fault chargeable to the plaintiff *** with the fault of all tortfeasors whose fault was a proximate cause of the death, injury, loss, or damage for which recovery is sought." 735 ILCS 5/2-1116(c) (West 2020). The trial court undertook the proximate-cause analysis with N&M Transfer and Nor-Lake and found no issue of genuine fact that Nor-Lake "contributed to [plaintiff's] injuries" or N&M Transfer "proximately caused the injury." The court then found plaintiff more than 50% at fault as a matter of law.

¶ 88        In deciding which alleged tortfeasors' fault must be compared with plaintiffs, we begin with N&M Transfer and Nor-Lake. Both N&M Transfer and Nor-Lake assert the trial court correctly found no genuine issue of material fact on the question of whether their conduct proximately caused plaintiff's injury. For a proximate-cause inquiry in a negligence action, the question is the following: "Was the defendant's negligence a material and substantial element in bringing about the injury, and, if so, was the injury of a type that a reasonable person would see as a likely result of his or her conduct?" *First Springfield Bank & Trust*, 188 Ill. 2d at 258-59. Assuming for the sake of argument N&M Transfer and Nor-Lake acted negligently, something neither party concedes nor do we find, there is no question of material fact as to whether plaintiff's injury was a type a reasonable person would see as a likely result of their conduct. There is no evidence from which a trier of fact could conclude a reasonable person would anticipate plaintiff would pursue the course of conduct he did. The undisputed evidence establishes (1) plaintiff was given a bill of lading that directed him to contact the Patels before delivery, (2) plaintiff had been informed to contact dispatch or his supervisor when faced with an unsafe condition, (3) plaintiff knew the weight and dimensions of the cooler and no one had prepared for its unloading from his trailer, (4) plaintiff in his own testimony stated he knew at least one loading dock was nearby, (5) plaintiff knew he could push the cooler back into the trailer and return to the Bloomington hub, (6) plaintiff decided to engage and then directed a "pallet maneuver" not taught by or seen used by N&M Transport drivers, and (7) plaintiff stepped under a tilting walk-in cooler. There is no genuine issue of material fact on the issue of proximate cause for these third-party defendants. Because there is no evidence to support the proximate-cause element of plaintiff's negligence claim, summary judgment was properly

granted to N&M Transport and Nor-Lake.

¶ 89        Although not found by the trial court, we find no genuine issue of material fact on the element of proximate cause on plaintiff's claim against the Patel defendants. The conduct plaintiff asserts the Patels negligently committed involved the failure to arrange for the delivery of the cooler and the decision to seek Randel's assistance. There is no genuine question of material fact that a reasonable person would foresee plaintiff, when faced with no arrangements for the unloading of the freight, would take the steps that plaintiff did and be injured as he was as a result. Summary judgment was properly granted to the Patel defendants.

¶ 90        There remains, however, a genuine issue of material fact as to proximate cause regarding the Beazly defendants. There is a question of material fact that plaintiff's injury from a cooler being lifted by Randel during the pallet maneuver was a foreseeable consequence.

¶ 91        The question of comparative negligence on summary judgment then turns on the comparison of plaintiff's conduct to Randel's. See 735 ILCS 5/2-1116(c) (West 2020) ("[T]he contributory fault chargeable to the plaintiff shall be compared with the fault of all tortfeasors whose fault was a proximate cause of the *** injury *** for which recovery is sought."). This is one of those rare cases where there is no issue of genuine fact on the question of whether plaintiff was at least 50% at fault for his injuries. The alleged negligence of Randel, assumed to be proven for our summary-judgment analysis, is that he negligently operated the forklift, unloaded the cooler improperly, and determined the cooler could be unloaded safely with his forklift. In contrast, in addition to the facts above regarding plaintiff's conduct, the undisputed facts show plaintiff suggested the Patels seek Randel's assistance without having met Randel or knowing his qualifications, asked Randel to unload the cooler, and, when Randel could not

unload it the way it was positioned, enlisted Randel's help in attempting the pallet maneuver. As a matter of law, plaintiff's actions go beyond the 50% threshold. Summary judgment in the Beazly defendants' favor is proper.

¶ 92      We note our decision here renders Beazly's appeal (case No. 4-21-0711) moot. We therefore dismiss it.

¶ 93                              III. CONCLUSION

¶ 94      We affirm the trial court's judgment in case No. 4-21-0683 and dismiss case No. 4-21-0711.

¶ 95      No. 4-21-0683, Affirmed.

¶ 96      No. 4-21-0711, Dismissed.